**Donald Anthony BURTON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 05–89–00376, 05–89–00377–CR.**

Court of Appeals of Texas,
Dallas.

Feb. 20, 1991.

Hal E. Turley, Dallas, for appellant.

Anne Wetherholt, Dallas, for appellee.

Before WHITHAM, ROWE and THOMAS, JJ.

## OPINION

THOMAS, Justice.

Donald Anthony Burton appeals from his convictions for aggravated robbery and aggravated kidnapping. After returning a guilty verdict, the jury sentenced Burton to ten years' confinement for aggravated robbery and forty years' confinement for aggravated kidnapping. In six points of error, Burton generally contends that the trial court erred in: (a) granting the State's challenges for cause for two veniremen; (b) overruling his objection to the State's improper jury argument; and (c) denying his motion to dismiss the indictments for violations of the statute of limitations, violations of his constitutional right to a speedy trial, and for violations of the Interstate Agreement on Detainers. We overrule all points and, accordingly, affirm the trial court's judgments.

## FACTUAL BACKGROUND

Shortly after midnight on May 1, 1982, Nathan Featherston, a security guard at an apartment complex, observed Burton urinating in the parking lot. Featherston told Burton that it was illegal to urinate in public and that he needed to leave the premises. Featherston further stated that there was a restroom in the sandwich shop across the street. Burton moved as if he were going to walk away when he suddenly turned about and pointed a gun. Burton walked over to Featherston, pointed the gun to Featherston's head and told him to open his mouth. When Featherston refused, Burton told him to turn around with his hands on his head. At this time, Burton struck him in the back of the head with the gun, knocking Featherston to his knees. When Featherston got up, he saw Burton point the gun and pull the trigger twice. Apparently there were no bullets in these two chambers because the weapon just clicked. As Burton pulled the trigger a third time, Featherston kicked and knocked him backward just as the gun fired. Featherston immediately ran away in order to summon police.

Within minutes, Burton appeared at an intersection a few blocks from the complex and forced his way into a car driven by Harry Pruitt, Jr. According to Pruitt, he was stopped at a signal light when Burton ran up and began banging a gun on the passenger window of his car. After threatening to shoot Pruitt, Burton got into the car. Burton then forced Pruitt at gunpoint to drive him around Dallas. Burton showed Pruitt that the gun contained three rounds and frequently jabbed Pruitt in the shoulder, neck, and temple with the cocked pistol. In addition, Burton frequently hit the gun against the front windshield caus-

ing it to break. After approximately two-and-a-half hours, Burton decided to lock Pruitt in the trunk of the car. Burton instructed Pruitt to be quiet because he would be outside listening. After about fifteen minutes, Burton told Pruitt that he was smart to have stayed quiet because "I've been out here waiting and I'd have put a plug through that trunk." Burton then began driving with Pruitt in the trunk. During the following six hours, Burton would periodically stop, get out of the car, and then return within minutes. At about 7:00 a.m., Burton opened the trunk and forced Pruitt at gunpoint to give him his wallet. After driving around for another two hours, Burton parked the car in a vacant parking lot in downtown Dallas. When Burton had been gone more than thirty minutes, Pruitt kicked in the back seat, crawled through the space into the car, and escaped. Pruitt ran to a nearby dry-cleaning shop where employees called the police. Burton's jacket and gun were found in the car. Police officers took Pruitt home in order to get another set of keys so that he could retrieve his car. When Pruitt and a friend returned to the parking lot approximately one hour later, the car was gone. Pruitt immediately called the police to report this incident. Burton was arrested a few hours later driving Pruitt's car.

Burton testified in his own behalf and did not dispute the events related by Featherston or Pruitt. Burton told the jury that earlier in the day in question, he walked over to Gus Antonus' apartment, which was adjacent to his complex. Antonus was a person he met through their mutual employment, the bail bond business. He said that he and Antonus played tennis, ate dinner, and watched a movie. Burton testified that he did not remember anything else about the evening or other events until his arrest the next afternoon. According to Burton, he did not know what had happened to him until he talked by telephone to Antonus approximately one week after

he was arrested. In this conversation, Antonus said that he had given Burton a quaalude laced with PCP. Burton stated that he did not know how this occurred because he did not remember taking any type of pill. Even though Burton could not provide a lot of details concerning the day's events, he told the jury that he had the gun because he had picked it up from Antonus that day. Burton explained that he had taken the gun as collateral for a $50 loan. The gun was broken and he had given it to Antonus to repair. Burton assumed that his encounter with Featherston occurred as he was walking home from Antonus' apartment.

## PROCEDURAL BACKGROUND

The record reveals the following procedural history arising out of this incident: [1]

Aggravated Robbery:

a) In May 1982, Burton was indicted for the aggravated robbery of Harry E. Pruitt, Jr. under cause number F82–86204–NM.

b) Counsel was immediately appointed and the case was set for announcement hearings and was ultimately set for trial.

c) Burton executed a number of speedy trial waivers, which will be discussed in connection with the fifth point of error.

d) Burton failed to appear for trial in March 1983, thus forfeiting his bond.

e) In June 1988, Burton was extradited from Nevada and returned to Texas. Announcement dates began in June 1988 and continued through March 1989. The circumstances surrounding Burton's arrest in Nevada and his subsequent return will be discussed in connection with points five and six.

f) Burton executed a number of speedy trial waivers, which also will be discussed in connection with the fifth point of error.

1. Burton was also indicted in June 1982 for the attempted murder of Nathan D. Featherston. This indictment was dismissed with the court's consent in April 1989 on the basis that the case arose out of the same transaction as the aggravated robbery and kidnapping and those matters had been tried.

g) In March 1989, the jury trial began which resulted in the guilty verdict and the assessment of ten years' confinement.

Aggravated Kidnapping:

a) In July 1988, after his extradition from Nevada, Burton was indicted for the aggravated kidnapping of Harry E. Pruitt, Jr. under cause number F88–95257–JM.

b) Announcement dates began in August 1988 and continued through January 1989.

c) In February 1989, Burton was reindicted under cause number F89–95204–M for the aggravated kidnapping of Harry E. Pruitt, Jr.

d) In March 1989, the jury trial began in cause number F89–95204–M which resulted in the guilty verdict and the assessment of forty years' confinement.

e) Following the jury convictions, the F88–95257–JM indictment was dismissed with the trial court's consent.[2]

## JURY SELECTION

▒▒▒▒ In the first and second points of error, Burton argues that the trial court erred in dismissing two veniremen for cause. Burton first complains of the dismissal of Elree Holt. Burton's pleas to the indictments were not guilty by reason of insanity. Thus, a great deal of the voir dire examination concentrated on this issue. The State maintains that Holt was disqualified due to his inability to comprehend his duty as a juror concerning the legal standard relating to Burton's burden of proof on the affirmative defense of involuntary intoxication and the difference between voluntary and involuntary intoxication. Article 35.16(a) of the Code of Criminal Procedure provides that a challenge for cause can be properly asserted for any facts that show that the prospective juror would be "incapable or unfit to

serve on the jury." TEX.CODE CRIM.PROC. ANN. art. 35.16(a) (Vernon 1989). A juror may be disqualified if he has such mental defect or disease as to render him unfit for jury service. TEX.CODE CRIM.PROC.ANN. art. 35.16(a)(5) (Vernon 1989). Great deference is to be given to the decision of the trial court in exercising its discretion in ruling on a challenge for cause because the trial court is present to observe the venireman, including his demeanor and tenor of voice. *Pyles v. State*, 755 S.W.2d 98, 106 (Tex. Crim.App.), *cert. denied*, 488 U.S. 986, 109 S.Ct. 543, 102 L.Ed.2d 573 (1988); *Hernandez v. State*, 506 S.W.2d 884, 887 (Tex. Crim.App.1974). Low intelligence is not necessarily a ground for challenge under article 35.16(a)(5); however, the venireman must be able to comprehend the limited function of a juror. *Gardner v. State*, 730 S.W.2d 675, 695 (Tex.Crim.App.1987). The record clearly indicates that Holt was confused and was unable to understand a majority of the legal issues which were crucial to a decision of this case. Further, the record reflects that Holt's views concerning the effects of intoxication were antagonistic to the State's theory of the case. Thus, we hold that the trial court properly excused Holt, and we overrule the first point.

▒▒▒▒ In the second point, Burton objects to the dismissal of venirewoman Joanne Fant. The record reveals that Fant's son had been convicted within the preceding months of burglary of an automobile. Although Burton's counsel obtained a commitment from Fant that she would be fair and impartial if selected, she also stated that she was concerned that she would project her feelings about her son into this case. She stated that her son's conviction had upset her to the point that she did not think she could be a fair juror to the State. Article 35.16(b) permits the State to challenge for cause on the grounds "[t]hat he has a bias or prejudice against any phase of law upon which the State is

---

**2.** In May 1982, Burton was also indicted for aggravated assault. This indictment alleged that on or about April 12, 1982, Burton used a handgun to threaten Antonio Hector Jimenz. Although this matter arose out of a different set of circumstances. All of the cases were handled together. Following the convictions in the instant cases, the aggravated assault matter· was dismissed.

entitled to rely for conviction or punishment." TEX.CODE CRIM.PROC.ANN. art. 35.-16(b)(3) (Vernon 1989). Where a prospective juror has a family member who has been convicted of a crime and states that he is unsure of his ability to be a fair and impartial juror in light of what he or his family have suffered, the courts have held the prospective juror to be disqualified even though he may later state under further questioning that he can be a fair and impartial juror. *Mize v. State,* 754 S.W.2d 732, 742 (Tex.App.—Corpus Christi 1988, pet. ref'd). Accordingly, the trial court did not err in granting the State's challenge for cause. The second point is overruled.

### JURY ARGUMENT

■ In the third point, Burton contends that the trial court erred in overruling his objection to improper jury argument during the punishment phase. Burton's argument was essentially that the jury should be lenient because he had been incarcerated for nearly two years before the trial. In response, the State argued that such leniency was not warranted as Burton had fled Texas after committing these crimes, had been convicted and paroled in Nevada for possession of stolen property, and then convicted of the felony offense of leaving the scene of the accident. The prosecutor then stated, "Taking names like DeSalvo like that Boston stranger [sic] Albert DeSalvo. Is this one of his heros?" The trial court overruled Burton's objection that the State was arguing outside the record and attempting to "inflame the passions of the jury with a heinous crime in another case." We note that the prosecutor made only this one comment about the "Boston Strangler" even though the objection was overruled. Burton acknowledged during the trial that he had used the name John Donald DeSalvo and that he was from Boston; however, the record contains no evidence as to why Burton used this name or that Albert DeSalvo was the Boston Strangler.

■ The Court of Criminal Appeals has defined the proper areas of jury argument to be: (1) summation of the evidence; (2) reasonable deductions from the evidence;

(3) response or answer to argument advanced by opposing counsel; and (4) pleas for law enforcement. *Darden v. State,* 629 S.W.2d 46, 52 (Tex.Crim.App. [Panel Op.] 1982); *Alejandro v. State,* 493 S.W.2d 230, 231 (Tex.Crim.App.1973). The State is not permitted to interject new facts during argument, but any error is not reversible unless, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute, or injects new facts, harmful to the accused, into the trial. *Cannon v. State,* 668 S.W.2d 401, 404 (Tex.Crim.App.1984); *Todd v. State,* 598 S.W.2d 286, 297 (Tex.Crim. App. [Panel Op.] 1980). The State argues that the comparison of Burton to the Boston Strangler was a reasonable inference from the evidence because it is common knowledge that the person known as the Boston Strangler was Albert DeSalvo. We do not accept the State's argument. While the fact that Albert DeSalvo is the Boston Strangler may be common knowledge in Boston, this Court is not prepared to state that it is common knowledge in Texas. The statement did not qualify as a summation of the evidence, a reasonable deduction from the evidence, a response or answer to argument advanced by opposing counsel, or a plea for law enforcement. Thus, we hold that the statement was an improper attempt to inject new facts in an attempt to inflame the minds of the jury and that the trial court erred in overruling the objection.

■ Having found error, we must now determine whether the comment contributed to the punishment. Unless we find beyond a reasonable doubt that the comment did not contribute to the sentences received, we must reverse Burton's sentences and remand the case to the trial court. *See* TEX.R.APP.P. 81(b)(2); TEX.CODE CRIM.PROC. ANN. art. 44.29(b) (Vernon Supp.1991). In determining whether an error is harmless, we are guided by the procedures set out in *Harris v. State,* 790 S.W.2d 568, 584–88 (Tex.Crim.App.1989). In *Harris,* the Court of Criminal Appeals stated that as a reviewing court, we are not to focus upon the propriety of the outcome of the trial. Instead, we are to be concerned with the

integrity of the process. *Harris*, 790 S.W.2d at 587. The procedure is that we must first isolate the error and all of its effects. Second, we must ask whether a rational trier of fact might have reached a different result if the error and its effects had not resulted. *Harris*, 790 S.W.2d at 588. Applying these standards to this case, we determine beyond a reasonable doubt that the State's improper jury argument made no contribution to Burton's punishment.

At the punishment trial, the jurors still had the testimony of the witnesses fresh on their minds. The offenses in this case involved infliction of extreme mental torture. While Pruitt did not suffer serious bodily injury, he was constantly in fear that he would die at any moment. During the two and one-half hours that Pruitt was in the car, Burton held a cocked pistol on him which dry fired and/or misfired on at least two occasions. Pruitt was forced to lie trapped in the trunk of his own vehicle for six hours while Burton drove around Dallas. During this time, Burton robbed Pruitt of his wallet. Before kidnapping Pruitt, Burton assaulted a security guard with a gun, pulling the trigger three times. Rather than stand trial for these crimes, Burton fled to Nevada where he continued to commit felonies. The range of sentences in both cases was five to ninety-nine years' or life imprisonment and a fine of up to $10,000. Even though the sentences imposed are well beyond the minimum allowed, we conclude that the single reference to the Boston Strangler did not disrupt the jurors' orderly evaluation of the evidence. *See Harris*, 790 S.W.2d at 588. In other words, we conclude that the State's improper comment did not effect the result. The third point is overruled.

## STATUTE OF LIMITATIONS

■ In the fourth point, Burton contends that the trial court erred in not dismissing the indictment for aggravated kidnapping for being violative of the statute of limitations. Article 12.01 of the Code of Criminal Procedure sets the limitations period for aggravated kidnapping at three years from the date of the commission of the offense. TEX.CODE CRIM.PROC.ANN. art. 12.-01(4) (Vernon Supp.1991) (catch-all limitations period for felonies). The offense was committed on May 1, 1982, and the indictment was presented on February 17, 1989, more than six-and-a-half years after the date of the offense. Article 12.05 provides that the limitations period is tolled during any period in which the accused is absent from the state. TEX.CODE CRIM.PROC.ANN. art. 12.05(a) (Vernon 1977). Of the six-and-a-half years between the commission of the offense and the presentment of the indictment, more than five years were tolled by Burton's absence from the state. The indictment, therefore, technically was presented within the statute of limitations.

■ Burton argues for the first time on appeal that the failure of the indictment to allege factors tolling the statute of limitations rendered the indictment fundamentally defective and deprived the trial court of jurisdiction. We disagree. Article five, section twelve of the Texas Constitution was amended in 1985 to provide that "[t]he presentment of an indictment or information to a court invests the court with jurisdiction of the cause."[3] The Court of Criminal Appeals has recently addressed substance defects and their effects on charging instruments pursuant to the 1985 amendments. *See Studer v. State*, 799 S.W.2d 263 (Tex.Crim.App.1990). The court held that so long as the charging

---

3. Article 5, section 12 of the Texas Constitution as amended in 1985 provides:

   (a) All judges of courts of this State, by virtue of their office, are conservators of the peace throughout the State.

   (b) An indictment is a written instrument presented to a court by a grand jury charging a person with the commission of an offense. An information is a written instrument presented to a court by an attorney for the State charging a person with the commission of an offense. The practice and procedures relating to the use of indictments and informations, including their contents, amendment, sufficiency, and requisites, are as provided by law. The presentment of an indictment or information to a court invests the court with jurisdiction of the case.

   TEX. CONST. art. V, § 12.

instrument is not "fundamentally defective," it invests the trial court with jurisdiction. Further, the court held that an appellant's failure to object to the defect "before the date on which the trial on the merits commences" results in a waiver of this defect. *Studer*, 799 S.W.2d at 273. Following that reasoning, we interpret the 1985 amendment to mean that at the moment a document fitting the constitutional and statutory definitions of an indictment is presented to a court, that court has jurisdiction of the cause regardless of the sufficiency of the indictment. While the 1985 amendment did not entirely do away with the concept of fundamental error, *i.e.*, a flaw in the indictment that deprives the court of jurisdiction, it limited it to those situations where the indictment fails to meet the constitutional and statutory definitions of an indictment. *See Milam v. State*, 742 S.W.2d 810, 814 (Tex.App.—Dallas 1987) (indictment failed to allege an offense and so failed to invest trial court with jurisdiction), *pet dism'd per curiam*, 791 S.W.2d 120 (Tex.Crim.App.1990).

The indictment charging Burton with aggravated kidnapping meets the constitutional requirements for an indictment because it is "a written instrument presented to a court by a grand jury charging a person [Burton] with the commission of an offense [aggravated kidnapping]." TEX. CONST. art. V, § 12. "Indictment" is statutorily defined as "the written statement of a grand jury accusing a person therein named of some act or omission which, by law, is declared to be an offense." TEX. CODE CRIM.PROC.ANN. art. 21.01 (Vernon 1989). The "reindictment" in this case meets this definition because it is a written statement of the grand jury charging Burton with aggravated kidnapping, an offense under section 20.04 of the Texas Penal Code. Since the indictment meets the constitutional and statutory definitions of an indictment, it was not fundamentally flawed, and the trial court acquired jurisdiction of the case when it was filed.

**4.** A written chronology admitted as Defendant's Exhibit 1 during the pretrial hearing is not in-

We do not reach the issue of whether the indictment's failure to allege tolling factors renders the indictment insufficient to support the conviction because Burton did not raise this issue prior to trial. Article 1.14 of the Code of Criminal Procedure provides that if the defendant fails to object to a defect of form or substance in the indictment before the day the trial commences, then the defect is waived and cannot be raised on appeal or in any other postconviction proceeding. TEX.CODE CRIM. PROC.ANN. art. 1.14(b) (Vernon Supp.1991). The fourth point is overruled.

### CONSTITUTIONAL RIGHT TO SPEEDY TRIAL

Prior to trial, a hearing was held on Burton's motions to dismiss alleging that he was denied his constitutional right to a speedy trial and that the State had violated the Interstate Agreement on Detainers. The uncontroverted testimony established that the following events transpired:[4]

a) On or about May 1, 1987, Burton was arrested under the name of DeSalvo in Las Vegas, Nevada on fugitive warrants from Dallas County. Three days later, Las Vegas authorities were notified that Dallas County would extradite Burton.

b) Burton signed a waiver of extradition on May 5.

c) On May 8, Dallas County was informed that Burton had been arrested on three felony warrants for leaving the scene of an accident and that he would not be released until the local charges were resolved.

d) Dallas County was notified on August 21 that Burton had been sent to a Nevada state prison for three years.

e) Dallas County sent a letter to the Southern Desert Correctional Center on August 25 placing a detainer or informal "hold" on Burton.

f) On March 29, 1988, Dallas County began the necessary paperwork to secure Burton's return to Texas under the IAD.

cluded in our record. Thus this sequence of events is a compilation of the testimony.

g) At this time, Burton refused to waive extradition and Dallas County began the necessary paperwork to accomplish this task.

h) The extradition process took two months to complete.

i) On June 21, Burton was booked into the Dallas County jail.

■ In the fifth point, Burton contends that the trial court erred in not dismissing both indictments because his constitutional right to a speedy trial had been violated. Both the sixth amendment to the U.S. Constitution and article one, section ten of the Texas Constitution provide the defendant in a criminal case with the right to a speedy trial. As the Supreme Court has noted, the right to a speedy trial is generally different from the other rights afforded criminal defendants. *Barker v. Wingo,* 407 U.S. 514, 519, 92 S.Ct. 2182, 2186, 33 L.Ed.2d 101 (1972). The deprivation of the right can work to the advantage of the defendant (such as where the defendant seeks delay for a tactical advantage), and the right is not as clear a concept as other rights because it is difficult to determine precisely when it has been denied. *Barker,* 407 U.S. at 521, 92 S.Ct. at 2187. The Supreme Court recommended a balancing test consisting of four factors in order to determine whether the defendant's right has been violated: the length of delay, the reason for the delay, the defendant's assertion of his right to a speedy trial, and prejudice to the defendant caused by the delay. *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192. Texas applies the same test. *Russell v. State,* 598 S.W.2d 238, 248 (Tex.Crim.App. 1980).

*Length of delay*

■ The length of the delay is calculated from the time the defendant is first accused. *United States v. Marion,* 404 U.S. 307, 321, 92 S.Ct. 455, 464–65, 30 L.Ed.2d 468 (1971); *Phillips v. State,* 650 S.W.2d 396, 399 (Tex.Crim.App. [Panel Op.]

1983). The original indictment arising out of this episode was returned on May 25, 1982, and the matter did not get resolved until March 13, 1989, a delay of almost seven years. This period is sufficiently long to raise the issue. *See Phillips,* 650 S.W.2d at 399 (a seventeen-month delay sufficiently raised the issue).

*Reason for delay*

Beginning in June 1982, and continuing through at least September 1982, Burton's counsel executed a number of instruments indicating that the defense waived all rights to a speedy trial and agreed to certain continuances.[5] Burton was scheduled to go to trial on March 28, 1982, less than a year after he was originally accused. After being released on bond in late December 1982, and prior to the trial date, Burton absconded to Nevada. Clearly, the four-year delay while Burton was a fugitive was wholly his fault. Once Burton was sentenced to prison in Nevada, Dallas County could have brought him back to stand trial for the 1982 crimes under the Interstate Agreement on Detainers.[6] Therefore, the delay from August 1987 until his parole in April 1988 was arguably the fault of the State. The next two-month delay was caused by Burton's refusal to waive extradition. The record also reflects that once he was returned and the Texas proceedings started again, Burton agreed to or sought five continuances that effectively postponed his trial until March 1989. It is impossible to determine from the record whether the State or Burton initiated these postponements; however, by agreeing to these actions, he indicated that he did not desire a speedy trial during this period. *See Barker,* 407 U.S. at 536, 92 S.Ct. at 2194–95 (where defendant failed to object to continuances, it is unlikely that there is a deprivation of the right to a speedy trial); *County v. State,* 668 S.W.2d 708, 711 (Tex. Crim.App.1984) (defendant agreed to large part, if not all, of delay).

---

**5.** The record contains four such instruments during this period and one written designation dated August 6, 1988, indicating that the State was ready for trial.

**6.** Burton complains of the State's failure to abide by the IAD in the sixth point of error.

*Assertion of right to speedy trial*

■ Burton argues that he made his first demand for a speedy trial by waiving extradition on May 5, 1987. While the assertion of the right to a speedy trial does not require the use of any particular words, the declaration should clearly convey to the trial court or the State that the defendant is asserting his right to a speedy trial. *See Phillips*, 650 S.W.2d at 401 (defendant not required to file motion for speedy trial or seek writ of mandamus to preserve right to speedy trial). The mere waiver of extradition does not rise to the level of an assertion of the right to a speedy trial. Burton contends that his next demand was made one week after he had signed the waiver of extradition. We note that this demand was made immediately after his arrest on the three Nevada felony warrants. The record establishes that Texas could not have acted during this time because of the unresolved Nevada charges. Finally, Burton claims that after he was incarcerated in the Nevada penitentiary, he wrote a series of letters and his wife made a number of telephone calls to the Dallas County prosecutor assigned to these cases.[7] Apparently, these letters and calls were attempts by Burton to assert his right to a speedy trial. For purposes of this opinion, we assume, without deciding, that these letters and calls were proper demands for a speedy trial.

*Prejudice from delay*

■ Three forms of prejudice arising from the deprivation of the right to a speedy trial have been identified by the Supreme Court: (1) oppressive pretrial incarceration; (2) anxiety and concern of the accused; and (3) the possibility that the defense will be impaired. *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193. In Texas, it is not necessary that the defendant prove actual prejudice, but rather there must only be *some* showing that the delay has been prejudicial. *Phillips*, 650 S.W.2d at 401. During the period from August 1987 until April 1988, Burton did not suffer "oppressive

pretrial incarceration" because he was legally confined in Nevada for crimes he committed there. Although Burton testified that he suffered anxiety and concern because of the outstanding charges, we note that it was not of a sufficient level to cause him to turn himself into the authorities and return to Texas. Further, his refusal to waive extradition, thereby delaying his transfer back to Texas, is another indication of the low level of his anxiety and concern about promptly disposing of the case.

The remaining prejudice Burton may have suffered was impairment of his defense. Burton contends that his defense was impaired during the delay because Antonus, a material witness, had disappeared. It is alleged that Antonus would have testified that he slipped a "bootleg" quaalude laced with PCP to Burton on the night of this incident. Burton testified that he knew of Antonus' whereabouts until May 29, 1988, which was almost a month before his return to Dallas County. Once trial preparations began, Burton and his defense counsel made diligent efforts to locate Antonus, but were unable to do so. Thus, Burton argues that the disappearance of Antonus was prejudice which entitles him to a dismissal of these two indictments. *See Barker*, 407 U.S. at 532, 92 S.Ct. at 2193. We disagree. There is nothing in the record to indicate that Antonus was available to testify at the March 1983 trial. Further, Burton acknowledged that he did not know whether Antonus would testify since he was afraid of being arrested for unlawful possession of drugs. It is apparent from the sequence of events that if Burton had waived extradition in April, he would have immediately been returned to Dallas County. Since Antonus did not disappear until May 29, Burton would have had almost a month to subpoena Antonus and take any other steps necessary to secure the testimony for trial. Here again, Burton was not sure that Antonus would have appeared. We conclude that Burton

---

7. The files of the Dallas County District Attorney's Office do not contain any such letters or notations of calls. The only proof of their exist-

ence are copies that Burton kept. Although the copies were admitted at the pretrial hearing, they are not in the record before us.

made no showing that the State's delay was prejudicial.[8] Thus, we hold that Burton's constitutional right to a speedy trial was not violated. The fifth point is overruled.

## INTERSTATE AGREEMENT ON DETAINERS

In the final point of error, Burton contends that both indictments should have been dismissed because of the State's failure to follow Articles III and IV of the Interstate Agreement on Detainers, TEX. CODE CRIM.PROC.ANN. art. 51.14 (Vernon 1979).[9] In response, the State urges this Court to declare the IAD unconstitutional because it deprives the prosecution of its exclusive discretion in preparing cases for trial, because it deprives the judges of their exclusive discretion in setting criminal cases for trial, and because Article V of the IAD mandates dismissal if Articles III or IV of the Agreement are not met. *See Meshell v. State,* 739 S.W.2d 246, 257 (Tex. Crim.App.1987) (holding the Speedy Trial Act unconstitutional for violation of separation of powers). The constitutionality of a statute will not be determined in any case unless such a determination is absolutely necessary to decide the case. *Smith v. State,* 658 S.W.2d 172, 174 (Tex.Crim.App. 1983); *Schin v. State,* 744 S.W.2d 370, 371 (Tex.App.—Dallas 1988, pet. ref'd). Consequently, if we hold that there were no violations of the IAD, the constitutional question becomes moot. Thus, we must first determine whether Burton's rights were violated under Articles III or IV.

The IAD provides a method for either a state or a prisoner to require another state in which the prisoner is incarcerated to return the prisoner to the first state in order to stand trial for crimes committed therein. The purpose of the IAD is set out in Article I, which states in relevant part:

The party states find that charges outstanding against a prisoner, detainers based on untried indictments, informations, or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party states and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints.

Art. 51.14, Article I. Article II provides the method for a prisoner to demand a speedy resolution of all outstanding charges. This provision would have permitted Burton to insist that he be transferred from the Nevada prison to Dallas County and require the State of Texas to try him on the indictments within 180 days of his "caus[ing] to be delivered to the prosecuting officer [the Dallas County District Attorney] and the appropriate court [the 194th Judicial District Court] written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment[s]." Art. 51.14, Article III(a). This "caus[ing] to be delivered" is done by the prisoner giving or sending the written notice and request for final disposition to *"the warden, commissioner of corrections, or other official having custody of him,* who shall promptly forward it together with the certificate to the appropriate prosecuting official and court...." Art. 51.14, Article III(b) (emphasis added). The custodial officials in the state where the prisoner is incarcerated have the duty to inform the prisoner of any detainers lodged against him and of his right to demand a trial under the IAD. Art. 51.14, Article III(c).

Burton first complains that the State violated the IAD by not trying him within 180 days of his sending a demand

---

**8.** Burton also argues in the brief that the delay prejudiced him by affecting his prisoner classification in Nevada and by preventing the sentences to run concurrently. Although the subject of prisoner classification was raised during the pretrial hearing, the record contains no evidence of how Burton's classification was affected by the outstanding Texas charges.

**9.** All further statutory references are to TEX.CODE CRIM.PROC.ANN. art. 51.14 (Vernon 1979) unless otherwise noted.

for a speedy trial to the Dallas County District Attorney's office. We note that Burton did not send this demand through the warden of the Nevada prison as required by Article III(b), but instead sent it directly to the prosecutor assigned to the case. Burton argues that the reason he followed the wrong procedure is because the Nevada prison officials did not inform him that Texas had lodged an informal detainer and, further, because they did not inform him of his right to demand a trial as required by Article III(c). This Court has previously held that the failure of another state to follow the IAD does not require dismissal of the Texas charges. *Schin,* 744 S.W.2d at 374. Burton's only obligation was to show that he notified the appropriate Nevada officials of his desire to resolve the outstanding charges against him, and he wholly failed to meet this requirement. While a defendant can notify the prosecutor and the court of the other state directly, if he does so, he is responsible for seeing that the notice is sent in the form required by the IAD, *i.e.,* the form must be sent by registered or certified mail, return receipt requested. *Haywood v. State,* 501 So.2d 515, 518 (Ala.Crim.App.1986); *McCallum v. State,* 407 So.2d 865, 869 (Ala.Crim.App.1981). The notices allegedly sent by Burton were not sent by registered or certified mail, return receipt requested. Further, there was no notice sent to the district court.[10] Because Burton never properly "caused to be delivered to the prosecuting officer and the appropriate court ... written notice of the place of his imprisonment and his request for a final disposition ... of the indictment," the 180–day period never began to run.

■ Burton next asserts that the State violated the IAD by not trying him within 120 days of the date he was brought back to Texas as required by Article IV. This section sets forth the method for a state to compel the return of a prisoner to stand trial on pending charges. It provides that a state can obtain *temporary* custody of a defendant, try him on charges pending in that state, and return him to the incarcerat-

ing state. Under this section, the trial shall be commenced within 120 days of the arrival of the prisoner in the receiving state. This section provides no relief because Burton was not returned to Texas under the IAD. The record reflects that Burton was paroled by the Nevada authorities and transferred to Texas under a Governor's warrant following an extradition hearing. Texas received permanent custody of Burton, not temporary custody. Thus we hold that the IAD was inapplicable.

■ Finally, Burton complains of the State's failure to timely file a formal detainer with the Nevada prison officials. He argues that the filing of the formal detainer form under the IAD would have triggered the Nevada officials' obligations to inform him of the detainer and his rights to demand a speedy trial. Thus, he claims that Texas was negligent and dilatory by not immediately filing an official detainer with the Nevada prison officials. It is uncontroverted that Texas sent a letter to the Nevada officials on August 25, 1987, notifying them that they were to detain Burton because of the pending charges. We conclude that this informal "hold" was sufficient. We find no requirement in the IAD that a party state must file a formal detainer or face dismissal of any pending indictments. We refuse to add further penalties to the IAD. *See Schin,* 744 S.W.2d at 374. This type of complaint is more appropriate under a claim of a constitutional right to a speedy trial, which we have already ruled was not violated. Because we hold that the State did not violate the IAD, we do not reach the issue of the statute's constitutionality. The sixth point is overruled and the trial court's judgments are affirmed.

WHITHAM, Justice, concurring.

I concur in the result. I remain of the views expressed in my concurrence in *Schin v. State,* 744 S.W.2d 370, 375 (Tex. App.—Dallas 1988, pet. ref'd). Therefore, to my mind, the receiving State, having set the provisions of the Agreement in motion, must bear the burden of assuring that its

---

**10.** There was testimony that Burton's wife *possi-*    *bly* called the court and talked to the trial judge.

provisions are enforced in the sending State. *Schin,* 744 S.W.2d at 375. I refer the reader to my concurrence in *Schin* for the reasons I am of this mind. *Schin,* 744 S.W.2d at 375–77. The State did not meet its burden. Hence, the proper remedy is dismissal of the indictments. *See Schin,* 744 S.W.2d at 376.

Nevertheless, I conclude that the remedy cannot be invoked. I reach this conclusion because the IAD is unconstitutional for the reasons expressed in my dissent in *Schin.* *See Schin,* 744 S.W.2d at 377. Therefore, the trial court did not err in refusing to dismiss the indictments. Consequently, I agree that we must overrule appellant's sixth point of error and affirm the trial court's judgment.