**Joel Lynn BAILEY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 05–92–01986–CR.**

Court of Appeals of Texas,
Dallas.

Aug. 22, 1994.

Kenneth Mark Deubner, Dallas, for appellant.

Donald G. Davis, Dallas, for appellee.

Before McGARRY, C.J., and STEPHENS[1] and ASHWORTH[2], JJ.

## OPINION

McGARRY, Chief Justice.

Joel Lynn Bailey appeals his conviction for theft of property in excess of $20,000. After a jury trial, the court assessed Bailey's punishment at twenty years' confinement and a $10,000 fine. The court also ordered restitution in the amount of $800,000. In six points of error, Bailey contends that (1) the evidence was insufficient to sustain his conviction; (2) the trial court erred in denying his motion to dismiss for want of a speedy trial; and (3) the trial court erred in failing to award him back-time for parole consideration. For the reasons set forth below, we modify the judgment of the trial court and, as modified, we affirm.

## FACTS

In 1988, Louis Camille worked for Summa Medical Corporation ("Summa"), a New Mexico corporation. His duties included raising capital for the company and finding potential investments for the company's cash-on-hand. In the spring of 1988, Camille was searching for new investment opportunities when a business acquaintance introduced him to Joel Bailey, who at the time was using the alias Bill Ballard. Over the next couple of months, Camille and Bailey (a.k.a. Ballard) talked extensively about the potential investment opportunities available to Summa. In

---

1. The Honorable Bill J. Stephens, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

2. The Honorable Clyde R. Ashworth, Justice, Court of Appeals, Second District of Texas at Fort Worth, Retired, sitting by assignment.

particular, they discussed the possibility of Summa investing in bank paper, letters of credit, and high-yield certificates of deposit. Bailey also told Camille that he had numerous contacts with offshore investors, all of whom had significant capital and were looking for investment opportunities in the United States.

In late spring or early summer of 1988, Camille decided to place some of Summa's money with Bailey for the purpose of investing in bank paper. Although Summa intended to open a bank account to facilitate the parties' arrangement, negotiations over the structure of the parties' agreement and the placement of the funds apparently took some time. Eventually, the parties agreed to open a Summa checking account at First Republic-Bank [3] in Dallas, Texas; however, the parties agreed that Bailey would not have signature authority over the account. Instead, Bailey (a.k.a. Ballard) persuaded Summa to list Carolina Bailey and Charlene Baggese, people Bailey represented to be his so-called "operatives," as signatories on the account. Camille did not learn until later that Carolina Bailey was in fact "Ballard's" wife and Charlene Baggese was Carolina's best friend.

To implement the parties' financial agreement, Summa passed a corporate resolution on June 8, 1988. The resolution and its addenda authorized the opening of a bank account in Summa's name and outlined the various trading procedures to be used by the parties. Specifically, the resolution authorized Carolina Bailey and Charlene Baggese to effectuate wire transfers from the Dallas account to any one of ninety-one banks listed in an addendum to the resolution. The resolution also required that any transfer of funds out of the Dallas account include the following language: "FOR THE PURCHASE OF AN INTEREST BEARING INSTRUMENT IN THE NAME OF SUM-MA MEDICAL CORPORATION." According to Camille, all of these conditions (i.e., the exclusion of "Ballard" as a signatory on the Dallas account, the limitation on the number of acceptable "receiving" banks, and the restrictive language) were designed to ensure the safety and security of Summa's funds.

On June 13, 1988, pursuant to the parties' agreement, Summa transferred $1,002,000 to the Summa account in Dallas. The following day, unbeknownst to anyone at Summa, Bailey filed articles of incorporation for a new "Summa Medical Corporation" with the Texas Secretary of State. The articles listed "Joel Bailey" as the incorporator and "Bill Ballard" as the corporation's registered agent. Camille testified that by filing the articles of incorporation, Bailey had effectively created a separate "Summa Medical Corporation" over which he had complete control. Camille testified that no one at Summa had authorized Bailey to take these actions.

The day after filing with the Texas Secretary of State, Bailey went to Allied Bank [4] in Houston, Texas and opened an account in the name of Summa Medical Corporation. According to Peggy Krolczyk, the custodian of records at First Interstate Bank (formerly Allied Bank), Bailey had sole signature authority over this account. Bailey made an initial deposit of $200 and then directed his wife to wire transfer the $1,002,000 from the Dallas account into the new Texas Summa account in Houston.[5] He further instructed her to include on the wire transfer the restrictive language outlined in Summa's corporate resolution. Carolina Bailey, believing herself to be an officer in Summa Medical Corporation, complied with Bailey's request.[6]

The following day, Bailey began drawing money out of the Houston account and using it for his own benefit. According to bank records, Bailey issued an $85,000 cashier's

---

3. First RepublicBank later became a part of NationsBank.

4. Allied Bank subsequently became a part of First Interstate Bank in Houston.

5. Allied Bank was one of the ninety-one banks listed as an acceptable "receiving" bank in Summa's corporate resolution.

6. Carolina testified at trial that Bailey had told her she was an officer in the corporation. Carolina apparently did not see Bailey again after she was arrested on July 18, 1988. She divorced him in 1990. Carolina was sued by Summa in a civil action and a judgment was entered against her for $1,002,000. That judgment remains outstanding.

check to American Foreign Exchange on June 22nd and initiated a wire transfer for over $754,000 on June 24th to Houston Numismatic Exchange. Barry Tatum, a transportation manager for Houston Numismatic, confirmed that these funds were used by Bailey to purchase 1800 American Eagle gold coins, valued at more than $830,000. Most of the other outgoing transfers shown on the statements appear to have been issued to Bailey in the form of either cashier's checks or cash. Peggy Krolczyk testified that by the end of June, the balance in the Houston account had fallen to $18,913.54.

Camille first learned about the transfer of funds to the Houston account when he was contacted by Ralph Adams, an employee of First Interstate Bank, in early July. After speaking with Adams, Camille attempted to call Bailey. When he could not locate him, Camille flew to Dallas. It was at that time that Camille learned that "Bill Ballard" was actually Joel Bailey. Camille contacted the Dallas County District Attorney's office and Summa's attorneys.

When Camille finally tracked Bailey down, Bailey agreed to meet Camille and Bob Strummer, a Summa attorney, at Love Field airport. During that meeting, Bailey informed Camille that he had disposed of Summa's funds in such a way that they could never be traced, and that if Summa ever wanted to recover the funds, it would have to execute certain documents indicating that it had loaned Bailey the stolen money. Camille agreed to this arrangement, apparently hoping that it would buy time for the district attorney's office to complete its investigation of Bailey. After signing the loan documents, Camille never saw or heard from Bailey again. Summa never recovered the $1,002,000 originally placed in the Dallas account.

## SUFFICIENCY OF THE EVIDENCE

In four points of error, Bailey challenges the sufficiency of the evidence to support his conviction. When reviewing a challenge to the sufficiency of the evidence, we review the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Turner v. State*, 805 S.W.2d 423, 427 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 112 S.Ct. 202, 116 L.Ed.2d 162 (1991). This standard leaves to the jury, as the trier of fact, the responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Bonham v. State*, 680 S.W.2d 815, 819 (Tex.Crim.App.1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985). The jury is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex.Crim.App.1991). Thus, the jury is free to accept or reject any or all of the evidence presented by either side. *Id.*

### Effective Consent

■ In his first point of error, Bailey contends the evidence was insufficient to establish that he took Summa's funds without Summa's effective consent. Bailey notes that the indictment in this case specifically required the State to prove that "no consent was given." He argues, however, that the evidence established just the opposite: that Summa had indeed consented to Bailey's control over the funds and had authorized the transfer of funds in this case. He notes in this regard that the corporate resolution authorized Carolina Bailey to transfer funds to any one of ninety-one named banks as long as the transfer contained certain restrictive language. Since the transfer in this case complied with these requirements, Bailey argues that the transfer and his subsequent control over the funds were both done with Summa's consent. Because the State failed to produce any other evidence establishing a lack of consent by Summa, Bailey maintains that the evidence was insufficient to support his conviction. We disagree.

Bailey was a fiduciary with respect to the funds placed in the Dallas account and, as such, he had a right to possession of said funds. However, once Bailey decided to divert the funds into the Houston account and utilize them for his personal benefit, his control over the funds could no longer be considered consensual. It is well settled that when a fiduciary decides, for whatever reason, to

unlawfully and permanently deprive the lawful owner of its property, the fiduciary is then acting in an unauthorized capacity, *i.e.,* he is then exercising unauthorized control over the property and has committed the offense of theft. *Freeman v. State,* 707 S.W.2d 597, 605–06 (Tex.Crim.App.1986).

We conclude that the following acts established Bailey's intent to permanently deprive Summa of its property: (1) his use of a false name during his negotiations with Summa; (2) his decision to incorporate a separate "Summa Medical Corporation" without notifying anyone at Summa; (3) his decision to open a Summa account over which he had sole signature authority (which was contrary to his agreement with Camille that he not have signature authority); (4) his actions in transferring Summa's funds without first notifying Summa of his intentions; (5) his use of the funds for his own benefit; and (6) his statements to Camille during the Love Field meeting that he had disposed of the money in a way that could never be traced. *See Thomas v. State,* 753 S.W.2d 688, 693 (Tex. Crim.App.1988) (permissible to infer accused's intentions from accused's later actions). Because Bailey manifested an intent to permanently deprive Summa of its property in this case, we hold that his exercise of control over the Dallas account was unauthorized. *Freeman,* 707 S.W.2d at 605. Thus, we hold that the evidence was sufficient to establish that Bailey took the funds in question without Summa's effective consent. Bailey's first point of error is overruled.

### Possession of Property

█ The indictment in this case alleged that Francisco Urrea, Jr., the president of Summa, had possession of the property allegedly taken in this case. In his second point of error, Bailey argues that the evidence was insufficient to support his conviction because it failed to establish Urrea's possession of the funds in the Dallas account. His argument, in essence, is that Urrea could not have been in possession of the funds, as required under the indictment, because the funds were at all times in the care, custody, and control of First RepublicBank.

The Texas Penal Code defines possession to include actual care, custody, control or management. *See* Tex.Penal Code Ann. § 1.07(a)(28) (Vernon 1974). Thus, if the evidence introduced at trial established that the funds in question were within Urrea's actual care, custody, control, or management, then we must find the evidence sufficient to sustain the conviction.

In this case, the evidence established that Urrea was Summa's chairman of the board and chief executive officer at the time of the events underlying Bailey's indictment. Urrea testified that the funds placed in the Dallas account were his responsibility and that he had full authority to invest those funds. Moreover, bank records introduced at trial indicate that Urrea was one of the designated signatories on the Dallas account and that he had full authority to withdraw funds from the account at any time. This evidence sufficiently establishes Urrea's control over the funds in the Dallas account. Since control is sufficient to establish possession under the penal code, we hold the State has met its burden of establishing Urrea's possession in this case. *See* Tex.Penal Code Ann. § 1.07(a)(28) (Vernon 1974). Bailey's second point of error is overruled.

### Control Over Property

In his third point of error, Bailey contends the evidence was insufficient to establish that he appropriated property as alleged in the indictment. He contends that there is a fatal variance between the manner of appropriation alleged in the indictment and the manner of appropriation proved at trial.

The penal code contains two alternative definitions of "appropriate":

(A) to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another; or

(B) to acquire or otherwise exercise control over property other than real property.

Tex.Penal Code Ann. § 31.01(5) (Vernon 1989).

█ The prosecution is required to specify in the indictment the manner of appropria-

tion it intends to prove at trial. *Gorman v. State*, 634 S.W.2d 681, 683 (Tex.Crim.App. 1982). When, as in this case, the indictment alleges an appropriation "without consent of any kind," it necessarily alleges an appropriation under section 31.01(5)(B). *Lewis v. State*, 659 S.W.2d 429, 432 (Tex.Crim.App. 1983).[7] The question presented is therefore whether there is sufficient evidence of a so-called "possessory" appropriation[8] under section 31.01(5)(B).

Bailey argues that no possessory appropriation was shown in the instant case because the transfer of funds from the Dallas bank to the Houston bank was effected by means of a wire transfer. According to Bailey, such a transfer does not contemplate any actual possession by either the sending or receiving party, and it is therefore incapable of forming the basis of a "possessory" appropriation under section 31.01(5)(B). He cites the court of criminal appeals' opinion in *Coats v. State*, 712 S.W.2d 520 (Tex.Crim.App.1986), for the proposition that an electronic bank transfer constitutes the transfer of a nonpossessory interest in currency. *Coats*, 712 S.W.2d at 523.

We conclude that Bailey has misconstrued *Coats*. *Coats* held that money could be appropriated *either* by acquiring or exercising control over property under section 31.01(5)(B) *or* by bringing about a transfer of title or other nonpossessory interest in the property under section 31.01(5)(A). *Id.* Other cases have shown that most property is capable of being appropriated in either manner. *See Gorman*, 634 S.W.2d at 683; *see also Coleman v. State*, 643 S.W.2d 124, 126 (Tex.Crim.App.1982) (nonpossessory interest in men's suits conveyed by bill of sale).

To the extent that the *Coats* opinion suggested that an electronic bank transfer conveys a nonpossessory interest in currency, it merely emphasized that such a transaction involves no *physical possession* of cash money. However, a so-called "possessory" ap-

propriation under section 31.01(5)(B) does not necessarily require physical possession. As the court in *Coats* noted, "[section] 31.01(5)(B) indicates that there can be more than one method of appropriation under that subsection alone since it defines appropriation as occurring whenever one acquires, 'or otherwise exercises control over property.' " *Coats*, 712 S.W.2d at 522 (quoting *Scott v. State*, 646 S.W.2d 638, 639 (Tex.App.–Austin 1983, no pet.)).

■ A bank balance is considered a cash equivalent. *Coats*, 712 S.W.2d at 523 n. 5. However, it is an intangible form of property. Intangible property is "possessed" through the exercise of control. *See Carter v. Massey*, 668 S.W.2d 450, 452 (Tex.App.–Dallas 1984, no writ) (life insurance benefits "possessed" for purposes of divorce decree because decedent controlled policy); *see also* TEX.PENAL CODE ANN. § 1.07(a)(28) (Vernon 1974). Consequently, we hold that intangible property such as a bank balance can be appropriated by the exercise of control over that property under section 31.01(5)(B). Such an appropriation also constitutes a transfer of a nonpossessory interest in the underlying currency under section 31.01(5)(A). *Coats*, 712 S.W.2d at 523.

■ We believe that the evidence sufficiently establishes that Bailey "acquire[d] or otherwise exercise[d] control" over Summa's funds for purposes of section 31.01(5)(B). Bailey orchestrated a wire transfer from the Summa account in Dallas to the Texas Summa account in Houston. Thus, it appears from the record that Bailey was able to control the transfer of funds from the Dallas account. In addition, Bailey had sole signature authority over the Houston account. Thus, we find that the evidence was sufficient to establish an appropriation under section 31.01(5)(B). Bailey's third point of error is overruled.

---

7. The court of criminal appeals did, however, criticize this manner of alleging the statutory variant of "appropriate." *Lewis*, 659 S.W.2d at 432.

8. For reasons that will become clear, appellant's characterization of subsection (5)(B) as a "pos-

sessory appropriation" can be misleading. More accurate is the court of criminal appeals' original shorthand rendition of subsection (5)(A) as "transfer of title" and subsection (5)(B) as "exercise of control." *Gorman*, 634 S.W.2d at 682 n. 3.

### Venue in Dallas County

■ The indictment in this case alleged that Bailey's unlawful acquisition and control of Summa funds occurred in Dallas County. In his fourth point of error, Bailey argues that the evidence was insufficient to prove this allegation. Bailey contends specifically that the evidence established an appropriation in Harris County, rather than Dallas County, because the wire transfer in question was completed in Harris County. Bailey relies on *Coats* for the proposition that a theft by wire transfer is completed only upon the crediting of an accused's account. *See Coats*, 712 S.W.2d at 523. While we agree with Bailey's statement of the *Coats* holding, we nevertheless find his reliance on the case to be misplaced.

As we noted previously, Bailey was a fiduciary with respect to the Summa funds in the Dallas account. Because Bailey manifested an intent to permanently deprive Summa of its funds while those funds were in the Dallas account, his exercise of control over the funds was unauthorized at its inception. *See Freeman*, 707 S.W.2d at 605. Thus, we conclude that the evidence was sufficient to establish beyond a reasonable doubt that Bailey unlawfully exercised control over Summa's funds in Dallas County.[9] Bailey's fourth point of error is overruled.

### SPEEDY TRIAL

In his fifth point of error, Bailey challenges the trial court's denial of his motion to dismiss for want of a speedy trial. Bailey argues specifically that the length of time between his initial arrest and his trial was long enough to trigger a speedy trial analysis in this case and that, once the appropriate factors are considered, it is clear that he was indeed denied his constitutional right to a speedy trial. *See Harris v. State*, 827 S.W.2d 949, 956 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992) (length of delay acts as triggering mechanism for speedy trial inquiry); *Hardesty v. State*, 738 S.W.2d 9, 10 (Tex.App.–Dallas 1987, pet. ref'd) (same). The State responds that the trial court properly denied Bailey's motion to dismiss because (1) the delay in this case was the result of Bailey's own actions (*i.e.* his flight from Dallas and subsequent confinement in Houston), and (2) no particular prejudice resulting from the delay was shown.

■ The Sixth Amendment of the United States Constitution guarantees every person the right to a speedy trial. U.S. Const. amend. VI. This right is made applicable to the states through the Fourteenth Amendment. *See Smith v. Hooey*, 393 U.S. 374, 374–75, 89 S.Ct. 575, 575, 21 L.Ed.2d 607 (1969). Article I, section 10 of the Texas Constitution likewise guarantees all persons the right to a speedy public trial. Tex. Const. art. I, § 10. Although the two constitutional rights are independent of each other, both utilize the same test for determining whether the denial of a speedy trial right has occurred in a given case. *See Harris*, 827 S.W.2d at 956. That test was first set out by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

■ In *Barker*, the Court outlined a four-factor balancing test to determine whether an accused has been denied his right to a speedy trial. *See Barker*, 407 U.S. at 530–33, 92 S.Ct. at 2192–93; *Hull v. State*, 699 S.W.2d 220, 221 (Tex.Crim.App.1985). The factors to be weighed in the balance include, but are not limited to, the length of the delay, the reason for the delay, the defendant's assertion of the right, and the prejudice to the defendant resulting from the delay. *See Barker*, 407 U.S. at 530–33, 92 S.Ct. at 2192–93; *Harris*, 827 S.W.2d at 956. None of the four factors alone is a necessary or sufficient condition to finding a deprivation of the right to a speedy trial. *See*

---

9. While we recognize that under most circumstances, venue need only be proven by a preponderance of the evidence, we note that in this case the trial court's charge specifically required the State to prove Bailey's unlawful acquisition and control in Dallas County *beyond a reasonable doubt*. We note that the inclusion of such language in a court's charge ordinarily raises the State's burden of proof on the issue. *See Cunningham v. State*, 848 S.W.2d 898, 902 n. 1 (Tex.App.–Corpus Christi 1993, pet. ref'd); *see also Arceneaux v. State*, 803 S.W.2d 267, 270 (Tex.Crim.App.1990).

*Barker,* 407 U.S. at 533, 92 S.Ct. at 2193. The length of the delay is generally measured from the time the defendant is arrested or formally accused. *See Harris,* 827 S.W.2d at 956. To some extent, the length of the delay is a triggering mechanism, so that a speedy trial claim will not be heard until passage of a period of time that is, prima facie, unreasonable under the existing circumstances. *Id.*

Bailey was indicted in this case on July 15, 1988. On November 21, 1991, Bailey was arrested in Harris County on an unrelated charge. The following day, Dallas County placed a detainer on Bailey in Harris County. On November 27, 1991, Bailey was sentenced on the Harris County charge to one year in prison. This sentence was discharged on May 20, 1992. On May 27, 1992, Bailey was transferred from Harris County to Dallas County pursuant to the instant charge. Bailey filed his motion to dismiss for lack of a speedy trial on July 3, 1992. His motion was heard and trial began on August 10, 1992.

 Bailey points to the eight-and-a-half-month delay beginning with his arrest in Harris County as support for his speedy trial claim. He does not urge the four-year delay that occurred following his original indictment on the underlying charge. Nevertheless, we conclude that, regardless of the date chosen, the delay in this case was lengthy enough to require a speedy trial analysis. *See Harris,* 827 S.W.2d at 956 (citing 2 LaFave & Israel, CRIMINAL PROCEDURE, § 18.2(b) (1984) for proposition that eight month delay was presumptively unreasonable and triggers speedy trial analysis). We note, however, that because the delay in this case was not unduly protracted, it does not weigh too heavily against the State. We turn then to a consideration of the remaining *Barker* factors.

The first factor we must consider is whether the State had any explanation for the eight-and-a-half-month delay in this case. The State reasons that the delay was due to Bailey's incarceration in Harris County on another charge. The State notes that Dallas County placed a detainer on Bailey the day after his arrest in Harris County and that Bailey was returned to Dallas County within a week of having discharged his Harris County sentence. In its brief, the State also suggests that it did not pursue an immediate trial of Bailey's charges because it knew that the Harris County sentence would be discharged in May 1992. Bailey's trial began within two and a half months of his removal to Dallas County.

Although the State would have us conclude that Bailey's incarceration in Harris County constituted a reasonable explanation for the delay in bringing him to trial, we disagree. Once Bailey was convicted on the Harris County charge, Dallas County presumably could have brought Bailey back to stand trial on the instant charge. *See e.g. Burton v. State,* 805 S.W.2d 564, 572 (Tex.App.–Dallas 1991, pet. ref'd) (considering Interstate Agreement on Detainers). There is nothing in the record before us that indicates that Dallas County was prevented from doing so. Because it does not appear from the record that Dallas County exercised due diligence in seeking Bailey's return to Dallas County, we decline to conclude that Bailey's confinement in Harris County was an acceptable reason for the delay in the instant case. For the reasons stated, we conclude, with respect to the first *Barker* factor, that the State has not presented a reasonable excuse for its delay in bringing Bailey to trial.

 Next, we consider Bailey's assertion of his speedy trial right. While the assertion of the right to a speedy trial does not require the use of any particular words, the declaration should be clear enough to convey to the trial court or the State that the defendant is asserting his right to a speedy trial. *See Burton,* 805 S.W.2d at 573. In this case, Bailey asserted his speedy trial right by filing a motion to dismiss the indictment. However, his motion was not filed until July 3, 1992, over seven months after Dallas County placed its November 22, 1991 detainer on Bailey. Thus, although Bailey knew of the Dallas County charge in November 1991, he did nothing to assert his right to a speedy trial for the next seven months. Because Bailey acquiesced in the delay from November 22nd to July 3rd, this factor in the delay does not weigh heavily against the State. *See Phillips v. State,* 650 S.W.2d 396, 401

(Tex.Crim.App.1983) (noting that accused's motivation in seeking dismissal rather than speedy trial may sometimes attenuate strength of accused's claim).

■ Finally, we consider Bailey's claims of prejudice resulting from the delay. Prejudice must be considered in light of the interests that the speedy trial right was designed to protect: (1) the prevention of oppressive pretrial incarceration; (2) the minimizing of the accused's anxiety and concern; and (3) the limiting of the possibility that the defense will be impaired. *See Harris*, 827 S.W.2d at 957. Bailey did not suffer "oppressive pretrial incarceration" during the period of delay because he was legally confined in Harris County for crimes he committed there. *See Burton*, 805 S.W.2d at 573. Although Bailey's continued incarceration would naturally tend to increase his anxiety level, there does not appear to be any evidence that Bailey's defense was impaired by the delay in this case.

Bailey argues that he was prejudiced by the delay because he lost the opportunity to have his two sentences run concurrently. He also argues that the conditions surrounding his Harris County sentence worsened as a result of the Dallas County detainer. While we recognize that both of these facts may tend to show prejudice under appropriate circumstances, we nevertheless do not conclude that they establish prejudice in this case.

Bailey's argument that he was prejudiced by the loss of concurrent sentences is unpersuasive. Dallas County placed a detainer on Bailey the day after he was arrested in Houston. Thus, Bailey is entitled to have the time spent in jail on the Houston conviction applied toward his sentence in this case. *See Ex parte Bynum*, 772 S.W.2d 113, 114 (Tex.Crim.App.1989); *Ex parte Pizzalota*, 610 S.W.2d 486, 488 (Tex.Crim.App.1980). Because Bailey receives credit for the time served on the Houston charge, he has not been prejudiced by any perceived loss of concurrent sentences in this case.

Also unpersuasive is his claim that the Dallas County detainer worsened the conditions of his imprisonment in Harris County. Our review of the record reveals no evidence of prejudice. There is no evidence, for example, that he was denied trusty status or other privileges such as work release or extra food as a result of the detainer. Without evidence substantiating his allegations, we cannot conclude that prejudice has been shown.

Weighing all four factors together, we conclude that the State did not violate Bailey's constitutional right to a speedy trial. Bailey was tried within two and a half months of being brought to Dallas County and within eight and a half months of being arrested in Houston. Bailey did not assert his speedy trial rights in this case until he had already been incarcerated for seven months (although he was clearly aware of the charges as a result of the detainer). Finally, the evidence does not establish any real prejudice suffered by Bailey as a result of the delay. He was entitled to receive credit on his current sentence for the time spent in the Harris County jail, and there was no evidence that Bailey lost any privileges as a result of the detainer placed on him by Dallas County. There was also no evidence that Bailey's defense was in any way impaired by the eight-and-a-half-month delay in this case. In light of the foregoing, we conclude that the trial court properly denied Bailey's motion to dismiss the indictment for want of a speedy trial. Bailey's fifth point of error is overruled.

### CREDIT FOR BACK–TIME

In his sixth point of error, Bailey contends that the trial court erred in failing to credit him for time served from November 22, 1991, the date of the Dallas County detainer. The State concedes that Bailey was entitled to credit for time served as of that date. *See Ex parte Bynum*, 772 S.W.2d at 114; *Ex parte Pizzalota*, 610 S.W.2d at 488. Because the judgment improperly indicates that Bailey was only entitled to credit for time served from May 27, 1992, we reform the judgment to read that Bailey will receive credit for time served from November 22, 1991.

The trial court's judgment is modified to reflect that Bailey will receive credit for time served from November 22, 1991 to August

14, 1992. As modified, the judgment of the trial court is affirmed.