In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-05-00014-CR


______________________________




JOHN ARLIN WALTERS, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 8th Judicial District Court


Hopkins County, Texas


Trial Court No. 0417442




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Chief Justice Morriss



O P I N I O N



 Brothers John Arlin Walters and Russell Walters had engaged in a decades-long battle over
perceived entitlements to family property and feelings of maternal preference. That battle ended
when John shot and killed Russell in a church parking lot in rural Hopkins County. 

 There has never been any question that John killed his brother. The pivotal question the jury
needed to answer in determining John's guilt or innocence was whether John acted in self-defense. (1) 
The jury found that John had not acted in self-defense, was therefore guilty of murder, and should
spend thirty-two years in prison as a result. The legal problem that has persisted through subsequent
appeals is the exclusion of the recording of a telephone conversation with John, initiated by sheriff's
deputy Sean English shortly after the shooting.

 Most recently, the Texas Court of Criminal Appeals has ruled that the recording of English's
call to John should have been admitted into evidence and has remanded the case to this Court for a
harm analysis. Because we hold that the error was harmful, we reverse Walters' conviction and
remand this case to the trial court for a new trial.

 English's call to John was not the only call that day. Three 9-1-1 calls were received at the
sheriff's office the day of the shooting in addition to the one call English initiated, which followed
the three incoming 9-1-1 calls. Understanding the other three calls is helpful to an understanding
of English's call to John.

 The first 9-1-1 call, received at 2:06 p.m., was from an unidentified female calling from the
church about "some type of disturbance." English dispatched an officer to the area. At 2:08 p.m.,
English received the second 9-1-1 call with regard to the situation at the church. This call was from
a then-unidentified male at John's residence who informed English that "[a] man has been shot at the
. . . church." After the second call, English dispatched emergency medical services' personnel and
other officers to the scene. The third 9-1-1 call was received at 2:13 p.m. from a cell phone user
identified as Carolyn Mobley. This caller advised she was at the church parking lot with the
shooting victim, whom she identified as "Russell Walters." She further advised that "John Walters"
was the shooter and that he had gone to his residence. Mobley described the location of that
residence, which was nearby. English advised the officers of this information, and two units went
to Walters' residence.

 After English testified about the three incoming 9-1-1 calls, the State offered its Exhibit
number 1, a Compact Disc on which those three calls were recorded. Walters objected on the ground
of hearsay, but the objection was overruled and the recording of the three 9-1-1 calls was played for
the jury.

 English then testified that, after the three 9-1-1 calls, at approximately 2:25 p.m., he placed
a telephone call to the "John Walters residence," from which he had received the second 9-1-1 call. 
English testified that the male who answered the telephone identified himself as John Walters and
that it seemed to be the same person who made the second 9-1-1 call. English said he asked John
if he wanted to talk about what had happened. The State interrupted English and proceeded to
question him about what was said to John concerning the firearm used in the shooting. English
testified he told Walters to unload the firearm and put it away. He also said he told Walters the
officers were outside his house and for him to "come out with his hands up where the officers could
see them." English quoted Walters as saying, "he'd hang the phone up, and he'd be right out." This
telephone conversation between English and Walters was also recorded at the sheriff's office.

 On cross-examination, English reiterated that, after the three 9-1-1 calls, he telephoned
Walters and asked him if he wanted to talk about what had happened. However, when Walters'
counsel asked English what Walters had said in response, the State objected on the ground of
hearsay. The trial court sustained the objection.

 As quoted by the Texas Court of Criminal Appeals, the relevant part of that unadmitted
telephone conversation is as follows:

 Hello.

 

 Hey John. 

 

 Yes.

 

 Hey this is Sean over here at the Sheriff's office. 

 

 Yeah.

 

 What's happening man? 

 

 My brother come over here threatening me, one of several times. 

 

 Did he? 

 

 Yep.

 

 Allright. 

 

 He told me one time he was gonna kill me out there at the barn. 

 

 Oh Really. 

 

 Yep.

 

 Allright John, everything's gonna be okay? 

 

 Yep.

 

 Uh, Are you inside your house right now? 

 

 Yes sir, I am inside my house right now. I'm the one that called 911. 


Walters v. State, 247 S.W.3d 204, 215 (Tex. Crim. App. 2007).


 John's counsel wanted to question English about this dialogue or to play the recording of the
whole call, based on the following testimony elicited by the State:

 [The State]: I want to talk to you specifically about the second 9-1-1 call that came
from the suspect, John Walters', residence. From that phone call, was there any
indication, during that call, as to that the person calling was the person that did the
shooting? 

 

 [English]: Not at that time, no.

 

 Q. Was there anything that would suggest that during that call? 

 

 A. No, sir. 

 

 Q. All right. And would you classify the emotional state of that particular caller
as being excited? 


 A. No, sir.

 

 Q. What would you characterize it as being during that call? 

 

 A. Calm. 

 

 . . . .

 

 Q. . . . From your experience as being a dispatcher for three years, have you ever
received calls like this before with regards to incidents? 

 

 A. Like this before? 

 

 Q. Yeah. 

 

 A. No, sir. 

 

 Q. Where just somebody would call and say, "Hey, somebody's been shot"? 

 

 A. No, sir, not exactly in those words. 

 

 Q. All right. Seemed to be a little out of the ordinary? 

 

 A. A little bit. 

 

 Q. What would you have expected?

 

 A. Somebody very excited, shaky, even, maybe. 

 

 Q. Did you get that here on this 9-1-1 call? 

 

 A. No, sir.

Walters v. State, 206 S.W.3d 780, 786-87 (Tex. App.--Texarkana 2006), rev'd & remanded, 247
S.W.3d 204 (Tex. Crim. App. 2007).

 The Texas Court of Criminal Appeals concluded that, after the State introduced the
recordings of the three incoming 9-1-1 calls and testimony from English about the outgoing call, the
trial court erred in declining to admit the recording of the outgoing call into evidence. The Texas
Court of Criminal Appeals concluded that the State had opened the door to the admission of the call
to correct a false impression that it had created and then emphasized during arguments: that John
had not admitted, nor explained why, he shot Russell. Walters, 247 S.W.3d at 220.

 The Texas Court of Criminal Appeals focused on the false impression left by the State, and
then concentrated its attention on the State's final argument, in which it stated that Walters did not
want to admit to shooting his brother, that he never did admit it, and that "the suggestion that,
somehow, he told 9-1-1 that when they called him back, there's no evidence of that, whatsoever."

 Of course, as the Texas Court of Criminal Appeals said, that claim was untrue, because John
did tell English during the call that he had shot his brother and that he had done so in self-defense,
but the State first prevented John from offering that evidence and then capitalized on and
compounded the false impression during its closing argument. That court concluded that the
evidence should have been admitted and that the error was not constitutional error, but merely
statutory. The case has been returned to us to do a harm analysis. 

 The sole issue before this Court is whether the error in excluding the evidence of English's
call to John is harmful, using the substantial harm analysis of Rule 44.2(b) of the Texas Rules of
Appellate Procedure. See Tex. R. App. P. 44.2(b). 

 When evaluating harm from nonconstitutional error flowing from the exclusion of relevant
evidence, we examine the record as a whole, and if we are fairly assured that the error did not
influence the jury or had but a slight effect, we conclude that the error was harmless. Ray v. State,
178 S.W.3d 833, 836 (Tex. Crim. App. 2005); Morales v. State, 32 S.W.3d 862, 867 (Tex. Crim.
App. 2000). The question before us is whether we have fair assurance that the exclusion of the
evidence did not influence the jury or had but a slight effect. See Johnson v. State, 967 S.W.2d 410
(Tex. Crim. App. 1998).

 As discussed in detail by the Texas Court of Criminal Appeals:

 The record shows that the State's questioning of Officer English and Beth
Hankins left the jury with the impression, later emphasized during closing arguments,
that appellant had not given any explanation of the shooting immediately after the
event. Officer English testified that he asked appellant if he wanted to talk about
what had happened. That question hovered in the air, but the State cut the witness
off and redirected him to other matters. The jury did not hear that, from the very
beginning, appellant told officers that he shot his brother in self-defense. Appellant's
words to Officer English were: "My brother come over here threatening me, one of
several times," and "He told me one time he was gonna kill me out there at the barn." 
The State played the initial 911 call three times for the jury. During closing
argument, it harped on appellant's preternatural "calmness" and inaccurately asserted
that appellant never told the 911 operator that he shot his brother:


 You know what that is? That's a man who had just murdered his
brother that didn't really know what to do about it, so he wants to act
like an innocent bystander that happened by. . . . What do you think
he was doing? He didn't want to admit it. He never did admit it. 
And the suggestion that, somehow, he told 9-1-1 that when they
called him back, there's no evidence of that, whatsoever.

 . . . . 


 Appellant did tell English during the second 911 call that he had shot his brother, and
that he did so in self-defense, but the State successfully objected to that evidence. It
created a false impression by successfully preventing appellant from offering this
evidence, and then it capitalized on and compounded the false impression at closing. 
This exclusion was error.

Walters, 247 S.W.3d at 220-21.

 We structure our analysis as set out by the Texas Court of Criminal Appeals in Ray, 178
S.W.3d 833. That opinion reversed this Court in a case in which we found insufficient harm and the
Texas Court of Criminal Appeals found otherwise. In Ray v. State, 148 S.W.3d 218, 226-27 (Tex.
App.--Texarkana 2004), rev'd, 178 S.W.3d 833 (Tex. Crim. App. 2005), the majority of this Court
concluded that the exclusion of testimony was not substantially harmful because the defendant was
able to get her defensive theory before the jury even absent the testimony and that it "would not have
added significantly to Ray's defense." The Texas Court of Criminal Appeals reversed our decision
on that point and remanded the case for a new trial. In its Ray opinion, the Texas Court of Criminal
Appeals focused the appropriate harm analysis:

 A review of the record as a whole reveals that the question of possession was not
only the most important issue in the case, it was the only contested issue in the case. 
Appellant was prejudiced because she was precluded from presenting third-party
witness testimony which would have corroborated and given independent credibility
to the defense she sought to establish. Because appellant's only argument was that
she did not possess the drugs, and the State's case rested on a contrary argument, the
erroneous exclusion of testimony that tended to establish possession in another was
a "serious" error. . . . However, as Justice Carter points out [in his concurring
opinion], this [whether it would have added significantly to Ray's defense] was an
issue for the jury to decide--not the court of appeals. As the jury did not have the
benefit of the third-party testimony upon the most critical element the State had the
burden to prove, we cannot say with fair assurance that the error did not influence the
jury or had but a slight effect.


See Ray, 178 S.W.3d at 836.

 Similarly, the question of self-defense was the only contested issue in this case. John was
precluded from presenting relevant evidence that was nearly contemporaneous with the shooting. 
It was evidence that thus would have provided a separate and different level of independent
credibility to the only defensive theory raised. 

 John argues that it was harmful to let stand the false impression that he was a cool, calm
killer who had refused to admit to the shooting and that he offered no explanation until trial. He also
points out that the Texas Court of Criminal Appeals did not disagree with language in this Court's
opinion stating that this evidence would have had the effect of altering the jury's impression of John,
his demeanor, and the information he gave, and also noting that defense counsel could not effectively
cross-examine Hankins and English about their conclusions about John's state of mind and behavior
without that evidence.

 The State responds by arguing that the error was harmless because the information was
before the jury from a different source and that, even in combination with the State's jury argument,
the error cannot be said to have caused John substantial harm. The State also argues that the
evidence was of such strength that, essentially, no matter what errors existed, harm cannot be shown,
because the overwhelming weight of the evidence supported the jury's finding that he did not act in
self-defense. See Motilla v. State, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002) ("overwhelming
evidence" is factor to be considered in assessing harm under subdivisions (a) and (b) of Rule 44.2).

 We do not find the State's claimed "overwhelming evidence." The only issue for the jury was
whether John acted in self-defense based on apparent danger, not whether he shot the victim. The
evidence consists of testimony that one of the shots struck Russell in the back and John's lack of
suitable reaction to the shooting as the State argued should be expected--i.e., that Walters was calm,
cool, collected, and did not show the expected mental and emotional fear. The State also suggests
that, because no weapon was found on Russell's body, John could not have perceived he was in
danger. That is a question for a jury to answer and is not a conclusion that is shown by
overwhelming evidence by these facts. It is the error's effect and not the existence of overwhelming
evidence or the lack thereof that dictates our judgment. Orona v. State, 791 S.W.2d 125, 130 (Tex.
Crim. App. 1990).

 Also factoring into the harm analysis is evidence from another source, Hankins, a registered
nurse and "First Responder" who tended to Russell after the shooting. Based on her review in open
court of the first 9-1-1 call, she described John as "not in shock, not shut down, and just matter of
fact." Walters, 247 S.W.3d at 215.

 The State suggests that it did not emphasize the result of the evidence being excluded. The
Texas Court of Criminal Appeals, and we, disagree. The State both emphasized the "lack" of
evidence and used it as a springboard for making other statements in jury argument.

 John's entire defense was premised on the preexisting bad relationship between the brothers,
the past violent or threatening behavior by Russell, and John's resulting reasonable fear of attack by
Russell. That defense acquires whatever believability it may have based in substantial part on John's
behavior and state of mind at or near the time of the shooting. In any murder prosecution, the
defendant's trial testimony is suspect because time has elapsed, creating both opportunity and time
to concoct a self-serving story. Thus, John's statements to English at or near the time of the incident
would likely have a higher level of credibility or persuasive effect on the jury. This was implicitly
acknowledged not just by the Texas Court of Criminal Appeals, but also by the State, which made
great effort both to get the three incoming 9-1-1 conversations into evidence and which it played
three times for the jury, and to keep this outgoing 9-1-1 conversation out. See Ray, 178 S.W.3d at
836. 

 Neither the record nor the State suggest any other method by which Walters might have
provided any underpinning to his defensive argument--that his actions were not premeditated or
calmly and coolly taken--than either the excluded evidence or his own testimony. Of the two, the
excluded evidence is the more credible and influential. Further, neither the record nor the State
suggest any other method of providing Walters with a basis for confronting and adequately
cross-examining English and Hankins about their opinions of John's mental or emotional state as
shown by the recording.

 As a result of the error, the jury had no opportunity to hear the recording, the best evidence
from which John's vocal inflections, tone of voice, and reactions could be gleaned. Thus, harm is
apparent. 

 We are hard-pressed to distinguish the harm analysis in this case from that issued by the
Texas Court of Criminal Appeals in Ray. We cannot say with fair assurance that the error did not
influence the jury or had but a slight effect. See Tex. R. App. P. 44.2(b). 

 We reverse Walters' conviction and remand this case to the trial court for a new trial. 


 Josh R. Morriss, III

 Chief Justice


Date Submitted: October 29, 2008

Date Decided: December 12, 2008


Publish
1. A jury found John guilty and assessed punishment at thirty-two years' imprisonment.



ble to Anderson, the evidence shows that he waited until June to mail
the motion and letter and that he had received the blank form in January. By his own admission, this
seemingly delayed attempt was the only attempt he made to contact the district clerk or the district
attorney. Since the trial court could have found either that Anderson waited five to six months after
he got the speedy trial form to mail it or that Anderson never mailed the motion and letter, we weigh
Anderson's alleged assertion of his right to a speedy trial in favor of the State and against a finding
that Anderson was denied his right to a speedy trial. (2) 



 (4) The Lack of Prejudice Weighs Against Anderson's Claim

 The last Barker factor examines the prejudice to the defendant. Munoz, 991 S.W.2d at 826. 
We assess this prejudice in the light of the interests which the speedy trial right is designed to
protect: (a) preventing oppressive pretrial incarceration, (b) minimizing anxiety and concern of the
accused, and (c) limiting the possibility that the defense will be impaired. Id. Of these subfactors
of the prejudice factor, "the most serious is the last, because the inability of a defendant adequately
to prepare his case skews the fairness of the entire system." Id. When, as here, the defendant is
incarcerated for another conviction, we are "mainly concerned with whether or not appellant's ability
to defend himself was prejudiced by the delay." Dragoo, 96 S.W.3d at 316 (quoting McCarty v.
State, 498 S.W.2d 212, 218 (Tex. Crim. App. 1973)). Certainly, a defendant incarcerated on another
charge is entitled to the same speedy trial rights as any other defendant. See Chapman, 744 S.W.2d
136. When a defendant makes a "prima facie showing of prejudice," the State carries "the obligation
of proving that the accused suffered no serious prejudice beyond that which ensued from the ordinary
and inevitable delay." Munoz, 991 S.W.2d at 826 (quoting Ex parte McKenzie, 491 S.W.2d 122, 123
(Tex. Crim. App. 1973)); McCoy, 94 S.W.3d at 303. 

 (a) Incarceration Subfactor. Anderson explained that the pending charges kept him from
going home, deprived him of certain time credits as a result of the detainer, and deprived him of the
possibility of serving sentences concurrently. On this point, he cites Turner, in which the Texas
Court of Criminal Appeals acknowledged that the delay of two years and three months deprived
Turner of the possibility of receiving a sentence at least partially concurrent with the sentence he was
first serving in federal prison. 545 S.W.2d at 139. Further, the Turner court explained, the detainer
by Texas authorities "may well have prejudiced his opportunity for clemency, pardon, parole, or []
trusty [status]." Id. In fact, the Turner court reversed the conviction and ordered the dismissal of
the prosecution in that case based on this prejudice and on the failure of the State to provide a valid
reason for the excessive delay. Despite factual similarities between Turner and the case at bar,
Turner is distinguishable from the instant case in that Turner persistently asserted his right to a
speedy trial and began doing so very early in his delay. See id. at 138.

 The Texas Court of Criminal Appeals reiterated its position on the possible prejudice posed
by placing a detainer on a defendant. See Chapman, 744 S.W.2d at 137. The Chapman court
explained that the detainer "resulted in the loss of certain liberty interests, including (1) the inability
to attend certain education and vocational programs; (2) he is not permitted certain off-unit or
outside prison compound privileges; and (3) he is ineligible for certain trusty classifications." Id.
at 137. When it considered this evidence in conjunction with the two-and-a-half-year delay, the
State's failure to offer a valid reason for the delay, and Chapman's assertion of his right, the
Chapman court conditionally granted Chapman's petition for writ of mandamus to compel the trial
court to set the trial within thirty days. Id. at 137-38. 

 The same concern regarding prejudice to the already-incarcerated accused was recognized
in Bailey v. State, 885 S.W.2d 193, 202 (Tex. App.--Dallas 1994, pet. ref'd). The Dallas court
pointed out, however, that lodging a detainer undermined the appellant's argument that he was
prejudiced by the possible loss of concurrent time. Id. at 202. The detainer meant that Bailey would
get credit on the second sentence from the date of the detainer. In other words, the detainer meant
that Bailey did receive credit on the second sentence for the time he spent in jail on the first;
therefore, the detainer caused no prejudice.

 Anderson also received credit. In fact, the record shows that Anderson received credit
beyond that received in Bailey. Anderson received credit from the date of the indictment rather than
simply the date the State lodged the detainer, meaning that Anderson was credited as having served
936 days of the three-year sentence imposed in the instant case. Further, as the State explains,
Anderson would not have otherwise received this credit. See Tex. Code Crim. Proc. Ann. art.
42.08(b) (Vernon 2006) (providing that sentence for offense committed while in TDCJ-ID will
commence immediately on completion of sentence for original offense). That is, since Anderson
was charged with an offense while incarcerated in a correctional facility, he was not eligible for
concurrent sentencing.

 That being the case, Anderson was not subjected to prolonged incarceration that he would
not otherwise have to serve. To the contrary, the State urges, Anderson received credit, because of
the delay, for time that he would not have otherwise been eligible to receive. This evidence satisfies
the State's obligation under Munoz to prove that Anderson "suffered no serious prejudice beyond that
which ensued from the ordinary and inevitable delay." As for the other possible collateral effects
of having the detainer lodged against him, the record fails to demonstrate any evidence of prejudicial
consequences. This factor weighs against a finding that Anderson's right to a speedy trial was
violated.

 (b) Anxiety Subfactor. In Zamorano, an appellant had testified that he lost $120.00 a day for
each  day  that  he  was  unable  to  work  and  had  missed  eleven  days  of  work  to  attend  court
dates. 84 S.W.3d at 654. The Texas Court of Criminal Appeals pointed out that, since the State did
not challenge his testimony, such evidence of economic effects was at least some evidence of the
type of "anxiety" considered under the prejudice prong of Barker. Id. The delay of four years itself
supported an inference of actual prejudice, as did testimony of direct economic costs, disruption of
the appellant's job, and weekly reporting to the bonding company during those four years. Id.

 Anderson testified that he lost sleep and suffered from "[l]ots of stress, worrying" as a result
of this long-pending charge. This stress, according to Anderson, resulted in him getting in trouble
and "getting into it" with others in jail. He explained that his continued bad behavior in jail caused
his uncle to decide not to give him the job that Anderson thought he was going to get on his release. 
This represents some evidence of anxiety as it relates to the Barker factor of prejudice and should
lend some weight to Anderson's claim.

 (c) Impairment of Defense Subfactor. Affirmative proof of prejudice is not essential to
Anderson's claim because excessive delay presumptively compromises the reliability of a trial in a
way neither party can measure. See Shaw, 117 S.W.3d at 890. Therefore, we presume that the
lengthy delay adversely affected Anderson's ability to defend himself. Id.; Dragoo, 96 S.W.3d at
315-16. This presumption is extenuated, however, by Anderson's lengthy acquiescence in the delay. 
See Doggett, 505 U.S. at 655; Shaw, 117 S.W.3d at 890; Dragoo, 96 S.W.3d at 316.

 Anderson urges that the denial of right to counsel was a symptom of the denial of his right
to a speedy trial. First, we note, Anderson conceded he did receive the letter from the Fannin County
district clerk's office in which he was informed of the steps he should take to have counsel appointed
for him. (3) Further, the record supports a finding that, despite being informed of the steps to get
appointed counsel, Anderson failed to take those steps. Again, we return to the importance of the
assertion of the right and point to this particular point as an illustration of how the failure to assert
the speedy-trial right affects the other Barker factors. 

 There is no evidence that the lengthy delay otherwise adversely impacted Anderson's ability
to present a defense to the charges. To the contrary, when the trial court asked Anderson what
witnesses he anticipated calling in his trial, he replied, "None." With no evidence to show prejudice,
we are left with only the presumption that the lengthy delay adversely affected Anderson's ability to
prepare a defense. This presumption, then, is undermined by the implied finding that Anderson
failed to make a timely demand for a speedy trial. From this finding we conclude that the
presumption of adverse effects is extenuated by Anderson's acquiescence to the delay. Considering
that this subfactor is often characterized as the most serious, the implied finding that Anderson failed
to timely assert his right to a speedy trial leads us to conclude that Anderson's failure to make some
showing of impairment to his defense weighs against his claim.

Conclusion

 We recognize that a lengthy, largely unjustified delay occurred in this case. But Anderson
failed to assert his speedy trial right. The prejudice caused by the delay is undermined by Anderson's
failure and by the State's evidence that shows that Anderson received credit for time when he would
have otherwise been subject to consecutive sentencing. This failure and its impact on the balancing
of the other factors distinguish this case from cases in which Texas courts have found a speedy trial
violation. Simply put, any prejudice caused by the delay is blunted by Anderson's failure to assert
his right to a speedy trial. After considering together the lengthy delay, the failure of the State to
offer a valid reason for most of the delay, the trial court's implied finding that Anderson failed to
assert his right to a speedy trial, and the presumption of adverse effects in light of that implied
finding, we conclude that the Barker factors weigh slightly against a finding that Anderson was
denied his right to a speedy trial.

 We affirm the trial court's judgment.


 

 Josh R. Morriss, III

 Chief Justice


Date Submitted: September 26, 2007

Date Decided: December 13, 2007


Do Not Publish
1. Though Anderson raises this issue in terms of both federal and state constitutional rights,
Zamorano v. State, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002), applied the same test:


 The Texas constitutional speedy trial right exists independently of the federal
guarantee, but this Court has traditionally analyzed claims of a denial of the state
speedy trial right under the factors established in Barker v. Wingo, 407 U.S. 514
(1972). 
2. We have reviewed our opinions in Fisher, 198 S.W.3d at 341, and Steinmetz, 968 S.W.2d
at 427. We disagree with counsel that those cases stand for the position that the failure to assert the
right to a speedy trial does not weigh against an unrepresented defendant.
3. Anderson appears to develop his contentions surrounding right to counsel only as they relate
to the denial of a speedy trial. To the extent that his brief can be read to raise the denial of right to
counsel as a distinct point of error, we address whether the trial court's failure to appoint counsel for
Anderson deprived him of his right to counsel. The trial court is under no duty to appoint counsel
until a defendant shows that he is indigent. Tex. Code Crim. Proc. Ann. arts. 1.051, 26.04, 26.051
(Vernon Supp. 2007) (governing appointment of counsel on showing of indigence); Gray v.
Robinson, 744 S.W.2d 604, 607 (Tex. Crim. App. 1988); Harriel v. State, 572 S.W.2d 535 (Tex.
Crim. App. 1978); Vincent v. State, 817 S.W.2d 190, 191 (Tex. App.--Beaumont 1991, no pet.). 
To conclude that the trial court's failure to appoint counsel between the October 2003 indictment and
June 2005 violated Anderson's right to counsel, we would have to hold that the trial court had a duty
to sua sponte appoint counsel for Anderson in an absence of a showing that he was indigent. Such
a holding is inconsistent with the previously noted line of cases. See Gray, 744 S.W.2d at 607;
Harriel, 872 S.W.2d at 537. To conclude that the trial court's failure to appoint counsel after
Anderson's alleged request for counsel in June 2005 violated his right to counsel, we would have to
conclude that the evidence at the hearing showed that Anderson made a sufficient showing of
indigence such that the trial court would have the duty to appoint counsel. Simply put, the record
of the hearing reveals no such evidence.