ACCEPTED
06-15-00037-cr
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
6/5/2015 11:36:22 AM
DEBBIE AUTREY
CLERK

**ORAL ARGUMENT REQUESTED**

CAUSE NO. 06-15-00037-CR

IN THE

COURT OF APPEALS

SIXTH JUDICIAL DISTRICT COURT OF TEXAS AT TEXARKANA

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS

6/5/2015 11:36:22 AM

DEBBIE AUTREY
Clerk

_____

THE STATE OF TEXAS, Appellant

V.

ERICA LYNN FULLER, Appellee

_____

ON APPEAL FROM THE 6TH JUDICIAL DISTRICT COURT
LAMAR COUNTY, TEXAS; TRIAL COURT CAUSE NO. 25545;
HONORABLE ERIC CLIFFORD, JUDGE

_____

# APPELLANT'S (STATE'S) BRIEF

_____

Jeffrey W. Shell                         Gary D. Young, County/District Atty.
*Attorney Pro Tem*                   County and District Attorney
Attorney & Counselor at Law   Lamar County Courthouse
2085 Berkdale Lane                  119 North Main Street
Rockwall, Texas   75087           Paris, Texas   75460
(214) 244-8480                          (903) 737-2470
(972) 204-6809 (fax)                 (903) 737-2455 (fax)

**ATTORNEYS FOR THE STATE OF TEXAS**

# IDENTITY OF PARTIES AND COUNSEL

Pursuant to Tex. R. App. P. 38.1(a), the identity of parties, along with the names and addresses of all counsel, is the following:

The State of Texas
Lamar County & District Attorney's Office
Lamar County Courthouse
119 North Main Street
Paris, Texas   75460

*Appellant*

Jill Drake and Laurie Pollard
County and District Attorney's Office
Lamar County Courthouse
119 North Main Street
Paris, Texas   75460

*Attorneys for The State of Texas*

Gary D. Young
County and District Attorney
Lamar County Courthouse
119 North Main
Paris, Texas   75460

*County and District Attorney*

Jeffrey W. Shell, *Attorney Pro Tem*
Attorney & Counselor at Law
2085 Berkdale Lane
Rockwall, Texas   75087

*Attorney for The State of Texas*

Erica Lynn Fuller
c/o The Moore Law Firm, L.L.P.
100 North Main Street
Paris, Texas 75460

*Appellee*

James R. Rodgers
The Moore Law Firm, L.L.P.
100 North Main Street
Paris, Texas 75460

*Attorney for Appellee*

# TABLE OF CONTENTS

**PAGE NO.:**

IDENTITY OF PARTIES AND COUNSEL . . . . . . . . . . . .     i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . .     ii

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . .     iii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . .     vi

STATEMENT REGARDING ORAL ARGUMENT . . . . .     viii

ISSUE PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . .     ix

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . .     2

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . .     18

ARGUMENT AND AUTHORITIES

        **SOLE ISSUE PRESENTED FOR RELIEF: THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING FULLER'S MOTION FOR DIRECTED VERDICT BECAUSE THE STATE ADDUCED LEGALLY-SUFFICIENT EVIDENCE FOR A LAMAR COUNTY JURY TO REASONABLY FIND THE ELEMENTS OF THE OFFENSE OF THEFT BEYOND A REASONABLE DOUBT.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     19

PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     33

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . .     34

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . .     35

# INDEX OF AUTHORITIES

**CASES:**                                                                **PAGE:**

*Bailey v. State,* 885 S.W.2d 193 (Tex. App.--Dallas 1994,
     pet. ref'd) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     25

*Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim.
     App. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     23,31

*Ex parte Serna*, 957 S.W.2d 598, 601 (Tex. App.--Fort
     Worth 1997, orig. proceeding) . . . . . . . . . . . . . .. . . . .     26

*Gorman v. State*, 634 S.W.2d 681, 683 (Tex. Crim.
     App. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     24

*Hill v. State*, 633 S.W.2d 520, 521 (Tex. Crim.
     App. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     25

*In re The State of Texas*, No. 06-15-00018-CR (Tex.
     App.--Texarkana February 11, 2015, orig.
     proceeding) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     vi

*In re The State of Texas*, No. 06-15-00018-CR, 2015 WL
     545838 *2, 2015 Tex. App. LEXIS 1277 *4 (Tex. App.--
     Texarkana February 11, 2015, orig. proceeding) (mem. op.,
     not designated for publication) . . . . . . . . . . . . . . . . . .     17,20,21

*Landers v. State*, 256 S.W.3d 295, 298 (Tex. Crim.
     App. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     22

*Pennington v. State*, 416 S.W.2d 815, 816 (Tex. Crim.
     App. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     26

*Rosenbush v. State*, 136 Tex. Crim. 50, 122 S.W.2d
     1071 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     26

| CASES: | PAGE: |
|---|---|

*Stacy v. State*, 819 S.W.2d 860, 861 (Tex. Crim. App. 1991) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*State ex rel. Young v. Sixth Judicial Dist.*, 236 S.W.3d 207, 208-09 (Tex. Crim. App. 2007) . . . . . . . . . . . . . . . . .  22

*State v. Chavera*, 386 S.W.3d 334, 336, 337 (Tex. App.--San Antonio 2012, no pet.) . . . . . . . . . . . . . . . . . . . . . . . .  22-23,23,31

*State v. Moreno*, 297 S.W.3d 512, 520 (Tex. App.--Houston [14th Dist.] 2009, pet. ref'd) . . . . . . . . . . . . . . . . . . . .  23,31

*State v. Muller*, 829 S.W.2d 805, 811-12 (Tex. Crim. App. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*State v. Redus*, 445 S.W.3d 151, 153 (Tex. Crim. App. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19-20

*State v. Savage*, 933 S.W.2d 497, 499 (Tex. Crim. App. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*State v. Savage*, 905 S.W.2d 272, 274 (Tex. App.--San Antonio 1994), *aff'd*, 933 S.W.2d 497, 499 (Tex. Crim. App. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22,23,31

*Stewart v. State*, 44 S.W.3d 582, 588, 589 (Tex. Crim. App. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24, 25, 26, 27

*United States v. Wilson*, 420 U.S. 332, 344-45 (1975) . . . . .  32

*Whitney Ladell Blake v. The State of Texas*, No. 06-11-00097-CR, 2012 Tex. App. LEXIS 926, at * 18, 2012 WL 361730, at * 4 (Tex. App.--Texarkana February 2, 2012, pet. ref'd) (mem. op., not designated for publication). . . . . . . . .  30

| STATUTES: | PAGE: |
|---|---|
| TEX. CODE CRIM. PROC. ANN. ART. 44.01(a)(3) (West Supp. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 |
| TEX. CODE CRIM. PROC. ANN. ART. 44.01(d) (West Supp. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21 |
| TEX. PENAL CODE ANN. § 31.03(a) (West Supp. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |
| TEX. PENAL CODE ANN. § 31.03(4)(B) (West Supp. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |
| TEX. PENAL CODE ANN. § 31.03(a)-(b), (e)(4)(A) (West Supp. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | vi |
| TEX. R. APP. P. 33.1(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 |
| TEX. R. APP. P. 38.1(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | viii |

## STATEMENT OF THE CASE

This is a theft case.

A grand jury in Lamar County returned an original indictment (CR, pg. 30) against Fuller that charged her with the state-jail felony offense of theft of property in the value of $1,500.00 or more but less than $20,000.00. *See* Tex. Penal Code Ann. § 31.03(a)-(b), (e)(4)(A) (West Supp. 2014). After a jury trial, a petit jury in Lamar County found Fuller guilty, as charged in the indictment. *See* RR, Vol. 5, pg. 173; CR, pg. 117.

After the jury's verdict, defense counsel re-urged a motion for directed verdict, which the trial judge granted. *See* RR, Vol. 5, pgs. 178-179. Later, the trial court signed a judgment notwithstanding the verdict. *See* CR, pg. 126.

The State of Texas, through the County and District Attorney of Lamar County, filed a petition for writ of mandamus, asking this Court for mandamus relief from the judgment entered by the trial court. This Court denied the petition. *See In re The State of Texas*, No. 06-15-00018-CR (Tex. App.--Texarkana February 11, 2015, orig. proceeding).

The State then timely perfected this appeal from the trial court's judgment notwithstanding the verdict (CR, pg. 126) by filing its notice of appeal. *See* CR, pgs. 127-129.

## STATEMENT REGARDING ORAL ARGUMENT

The State of Texas will request oral argument. *See* Tex. R. App. P. 38.1(e).

Oral argument should be permitted in this case and this Court's decisional process would be aided by oral argument, *see id*, because legal sufficiency should be judged by the quality of the evidence and the level of certainty it engenders in the fact-finder's mind. That quality of evidence and level of certainty should be articulated to this Court during oral argument.

## ISSUE PRESENTED

**SOLE ISSUE PRESENTED FOR RELIEF:** THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING FULLER'S MOTION FOR DIRECTED VERDICT BECAUSE THE STATE ADDUCED LEGALLY-SUFFICIENT EVIDENCE FOR A LAMAR COUNTY JURY TO REASONABLY FIND THE ELEMENTS OF THE OFFENSE OF THEFT BEYOND A REASONABLE DOUBT.

CAUSE NO. 06-15-00037-CR

IN THE

COURT OF APPEALS

SIXTH JUDICIAL DISTRICT COURT OF TEXAS AT TEXARKANA

_____

THE STATE OF TEXAS, Appellant

V.

ERICA LYNN FULLER, Appellee

_____

ON APPEAL FROM THE 6TH JUDICIAL DISTRICT COURT
LAMAR COUNTY, TEXAS; TRIAL COURT CAUSE NO. 25545;
HONORABLE ERIC CLIFFORD, JUDGE

_____

# APPELLANT'S (STATE'S) BRIEF
_____

TO THE HONORABLE SIXTH COURT OF APPEALS AT
TEXARKANA:

COMES NOW, The State of Texas, by and through the elected
County and District Attorney of Lamar County, Gary D. Young, and the
Lamar County and District Attorney's Office, files this Appellant's (State's)
Brief under Rule 38.1 of the Texas Rules of Appellate Procedure.

Unless otherwise indicated, the State of Texas will be referred to as

-1-

"the State."  Erica Lynn Fuller will be referred to as "Fuller."

## STATEMENT OF FACTS

### Factual Background.

From September of 2009 to April of 2012 (RR, Vol. 4, pgs. 41, 43, 116), Melissa Neisler (Neisler) was the business office manager at Brentwood Terrace Nursing and Rehab (RR, Vol. 4, pg. 41), which was previously called "Parkview."  *See* RR, Vol. 4, pg. 45.  At some point, another corporation, Diversicare, bought "Parkview," rebuilt the facility and renamed it "Brentwood." *See* RR, Vol. 4, pg. 45; Vol. 5, pg. 7.  The "Brentwood" facility was inside the city limits of Paris, Lamar County, Texas. *See* RR, Vol. 4, pg. 52.

Neisler started working at "Brentwood" a few months after they opened the building.  *See* RR, Vol. 4, pg. 45.  Neisler did the "trust posting" and account receivable:  "the money that goes straight into the operations." *See* RR, Vol. 4, pg. 42.  The operations account, an actual business account, paid bills that "would be the payroll, [the] vendors, the day-to-day operations" like electric bills.  *See* RR, Vol. 4, pg. 138.  *See also* RR, Vol. 5, pg. 22 (nursing care, salaries, food, electricity, water).  Neisler made the entries into the set of books for the operations side.  *See* RR, Vol. 4, pg. 140.

"Brentwood" had two (2) bank accounts: "operations and trust." *See* RR, Vol. 4, pg. 43. *See also* RR, Vol. 4, pgs. 47-48, 137, 140. It's even required to have a separate title and naming of the account. *See* RR, Vol. 5, pg. 15. In May of 2010, there were literally two different bank accounts. *See* RR, Vol. 4, pg. 48. The "trust" account was a "local bank" at Lamar National Bank. *See* RR, Vol. 4, pgs. 119, 269; Vol. 5, pgs. 13, 15, 19. The operations fund was handled through the electronic scanning system. *See* RR, Vol. 5, pg. 15. "That [was] in a out-of-state bank." *See* RR, Vol. 5, pg. 15.

The "Brentwood" bookkeeping system was divided into the trust fund side and the operations side. *See* RR, Vol. 4, pg. 51. There's two separate books that were marked clearly on the front, operations and trust. *See* RR, Vol. 4, pg. 97. *See also* RR, Vol. 4, pg. 140.

By law, all nursing homes were required to have a trust fund. *See* RR, Vol. 4, pg. 137. *See also* Vol. 5, pg. 14 ("It is a state regulation that we offer this service to the residents."), pg. 20. "It works just like a bank." *See* RR, Vol. 4, pg. 137. *See also* RR, Vol. 4, pg. 179. The "trust fund" was basically "Brentwood" serving as a bank for the residents. *See* RR, Vol. 4, pg. 56.

Also, "[t]he petty cash fund is actually cash from that resident trust fund." *See* RR, Vol. 4, pg. 145. *See also* RR, Vol. 4, pg. 147. The resident would sign a petty cash receipt book when he or she wanted to withdraw funds from the petty cash. *See* RR, Vol. 4, pg. 145. The petty cash fund was kept in the business office and was locked in a drawer. *See* RR, Vol. 4, pg. 146. It was in Fuller's office, and Fuller was supposed to manage the money that's coming in and going out of that petty cash fund. *See* RR, Vol. 4, pg. 146. It would be included with the trust fund records. *See* RR, Vol. 4, pg. 147.

When money would come in, like checks from Social Security, either in the mail or by person, it went to the "trust fund." *See* RR, Vol. 4, pg. 255. The actual data entry was into the accounts receivable trust fund system. *See* RR, Vol. 5, pg. 20. "What is due to the facility is paid to the facility." *See* RR, Vol. 4, pg. 56. *See also* RR, Vol. 4, pg. 179 ("You deposit it into the operations account to pay their bill."). The check was written from the trust fund account to the operations account, and that that check was scanned into the operations account. *See* RR, Vol. 5, pg. 21. That was to pay resident's room and board in the nursing facility. *See* RR, Vol. 5, pg. 21. Fuller would write the check from the trust fund to the operations fund. *See* RR, Vol. 5,

pg. 25.

"[T]he rest of it is for the residents to get whatever they want, beauty shop, going to Walmart, whatever it is, go buy a Coke." *See* RR, Vol. 4, pg. 56. *See also* RR, Vol. 4, pg. 200. It was "their personal spending, their free money." *See* RR, Vol. 4, pg. 255.

Neisler knew Fuller and Angie Whipkey (Whipkey), the receptionist. *See* RR, Vol. 4, pgs. 44-45, 159, 234; Vol. 5, pg. 17. *See also* Defendant's Exhibit 3. Whipkey started working for "Brentwood" in August of 2009. *See* RR, Vol. 4, pgs. 233, 237. Whipkey would "answer the phone, greet families, receipt trust and AR." *See* RR, Vol. 4, pg. 234. Whipkey took care of three receipt books. *See* RR, Vol. 4, pgs. 235, 259. Whipkey "did all the receipting of all the checks that would come in to the front." *See* RR, Vol. 4, pg. 259. *See also* RR, Vol. 5, pg. 24.

In the very beginning, Whipkey got the receipts really mixed up in the books. *See* RR, Vol. 4, pg. 251. Whipkey could've made a mistake on a receipt due to "a lot of distraction." *See* RR, Vol. 4, pgs. 253, 259; State's Exhibit 3.

Whipkey had bank bags and "was receipting the money and holding onto it until it went to the business office and was taken care of." *See* RR,

Vol. 4, pgs. 235-236. *See also* RR, Vol. 4, pgs. 239, 273. Any deposit for the "trust fund" was put into a bag until Neisler, Whipkey or Ms. Millsap went to lunch. *See* RR, Vol. 4, pg. 57; Vol. 5, pg. 18. The bank bags "had to be locked up in the business office -- for lunch." *See* RR, Vol. 4, pg. 239. Then, it was taken to Fuller. *See* RR, Vol. 4, pg. 57. *See also* RR, Vol. 4, pgs. 118, 239, 274.

According to company policy, "it had to be locked up in the filing cabinet." *See* RR, Vol. 4, pg. 57. *See also* RR, Vol. 4, pg. 58. The filing cabinet was behind Fuller's desk in the business office. *See* RR, Vol. 4, pg. 57. Fuller had the keys. *See* RR, Vol. 4, pg. 58. Fuller was the person responsible for filling out the paperwork to account for how much money was taken in for that day. *See* RR, Vol. 4, pg. 58. *See also* RR, Vol. 4, pgs. 192, 239-240.

Fuller was in the position of payroll and human resources ("HR"). *See* RR, Vol. 4, pgs. 44-45, 124. According to her job description, Fuller was in accounts payable. *See* RR, Vol. 4, pg. 122; Defendant's Exhibit 2. The "other half" was HR. *See* RR, Vol. 4, pg. 124.

Neisler saw Fuller "every day." *See* RR, Vol. 4, pg. 52. Neisler was "Fuller's backup." *See* RR, Vol. 4, pgs. 50, 58-59.

Neisler maintained the payroll and could put people into the system, new hires; she could fill out change forms if somebody quit or had a change in rate. *See* RR, Vol. 4, pg. 59. If Neisler had a question, she could also call corporate if there was an insurance question, or to log in for access to programs. *See* RR, Vol. 4, pg. 59.

Along with "paying employees," Fuller "made all the deposits for trust and the operations side, the "AR side." *See* RR, Vol. 4, pg. 46; Vol. 5, pgs. 15, 25. "AR" meant accounts receivable. *See* RR, Vol. 5, pg. 14.

Fuller was the bookkeeper that handled accounts receivable, accounts payable and payroll. *See* RR, Vol. 5, pg. 7. In 2007 and 2008 (RR, Vol. 5, pg. 9), Fuller did not handle money. *See* RR, Vol. 5, pg. 7. At that time, the administrator was Norma Vinters (Vinters). *See* RR, Vol. 5, pgs. 8, 9 11. Vinters would have handled any cash disbursements or deposits. *See* RR, Vol. 5, pgs. 8-9.

By 2010 however, Fuller was in charge of the trust funds. Fuller was responsible for filling out the deposit slips (RR, Vol. 4, pg. 46) for the trust fund, which were handwritten at that time. *See* RR, Vol. 4, pg. 47; Vol. 5, pg. 19. According to Brown, Fuller "entered into the system how much money, the deposits and the withdrawals from the trust fund." *See* RR, Vol.

4, pg. 139.

Neisler was never given access to the trust. *See* RR, Vol. 4, pg. 60. She just thought "that was corporate policy." *See* RR, Vol. 4, pg. 61.

The deposit slips on the operations side were "electronic." *See* RR, Vol. 4, pg. 47. Fuller scanned the checks, which went into the corporate bank and the deposit slip was faxed "to corporate of how much it was." *See* RR, Vol. 4, pg. 47.

**May and December (2010) Audits by the Texas Department on Aging and Disability.**

Pam Thompson (Thompson) monitored trust funds at the Department of Aging and Disability Services ("DADS") with the State of Texas. *See* RR, Vol. 4, pg. 195. Thompson was required to do periodic audits in northeast Texas (from Tyler to Texarkana and up to the Paris/Bonham area), including "Brentwood" in Paris since 2008. *See* RR, Vol. 4, pgs. 196-197.

In May of 2010, Thompson and "DADS" came in, and did its audit. *See* RR, Vol. 4, pgs. 49, 141, 198. In May of 2010, "there were problems." *See* RR, Vol. 4, pg. 199. "There were a lot of disbursements without signatures." *See* RR, Vol. 4, pg. 200. In May, the audit was limited to 30 residents. *See* RR, Vol. 4, pg. 205. The audit in May had "excessive errors." *See* RR, Vol. 4, pg. 207.

Brown was not there then, but "DADS" did an audit at that time. *See* RR, Vol. 4, pg. 141. Although she "was not there during that time," Brown identified a check that came from "Brentwood" to "clear state audit." *See* RR, Vol. 4, pgs. 142-143; State's Exhibit 1.

### **Arrival of Administrator, Ruth Brown.**

In August of 2010, Ruth Brown (Brown), an administrator, began working at "Brentwood" where she met Fuller. *See* RR, Vol. 4, pgs. 131, 134. Fuller had worked at "Brentwood" before Brown started in August of 2010. *See* RR, Vol. 4, pg. 135. Fuller was "the HR, human resources" and handled payroll, accounts payable and the "trust fund." *See* RR, Vol. 4, pg. 134.

When Brown first started working at "Brentwood," Fuller came into her office on a couple of occasions and asked if she was going to fire her. *See* RR, Vol. 4, pg. 135. Brown told her "no." *See* RR, Vol. 4, pg. 135. Brown told her that she "wasn't there to fire anybody" and that she was there as the new administrator. *See* RR, Vol. 4, pg. 135. Brown described Fuller as "fidgety" and "very inquisitive" on why she was there. *See* RR, Vol. 4, pg. 136. *See also* RR, Vol. 4, pg. 168. Yet, Fuller had exemplary performance appraisals by the previous administrator, Ms. Vinters. *See* RR,

Vol. 4, pgs. 168-169; Defendant's Exhibits 4, 5, 6 and 7.

**Audit in November or December of 2010.**

During the first week of December of 2010, "it was much better" (RR, Vol. 4, pg. 204) because "the petty cash had signatures next to it." *See* RR, Vol. 4, pg. 205. As in May, the audit was limited to 30 residents. *See* RR, Vol. 4, pg. 205.

But, the auditor with "DADS" could not get the account to balance. *See* RR, Vol. 4, pgs. 147-148. Brown had the regional business office manager come in and teach her how to use the reconciliation form, which she went over with Fuller. *See* RR, Vol. 4, pg. 148. They were not able to reconcile the petty cash box. *See* RR, Vol. 4, pg. 149. "It was off." *See* RR, Vol. 4, pg. 149.

At that time, Brown suspended Fuller and Angie Whipkey while it was investigated further, according to normal industry practice. *See* RR, Vol. 4, pgs. 150, 151. These two people "had access to the actual petty cash box." *See* RR, Vol. 4, pg. 152. Whipkey's suspension had to do with "the trust fund money missing." *See* RR, Vol. 4, pg. 242. Fuller was suspended at the same time. *See* RR, Vol. 4, pgs. 243-244.

To further the investigation, Brown contacted Caryon Miller (Miller),

a "regional financial specialist" from Brentwood's "corporate office." *See* RR, Vol. 4, pgs. 149, 152-153. Diversicare had hired Miller in September of 2007 (RR, Vol. 5, pgs. 6-7), as the original "business office consultant." *See* RR, Vol. 5, pg. 6. In June of 2013, Miller became the Medicaid billing manager for Diversicare. *See* RR, Vol. 5, pgs. 5-6. Miller did not have an accounting degree. *See* RR, Vol. 5, pgs. 45, 124.

In January of 2011, Brown contacted Miller because "something seemed off in the cash receipt box." *See* RR, Vol. 5, pg. 34. As part of the investigation and audit, Miller looked at Thomas Hughes' account. *See* RR, Vol. 5, pg. 34. Thomas Hughes was considered "full vendor" because Medicaid covered his bill in full and he did not owe any funds personally. *See* RR, Vol. 5, pg. 34. His room and board would vary by his level of care and his clinical assessments, but was based on the standard state reimbursement rate. *See* RR, Vol. 5, pg. 35. The amount of $3,500 a month would be an average. *See* RR, Vol. 5, pg. 35. Miller looked at this account by starting in May and stopping on 12/31/2010 with an ending balance of $978.75. *See* RR, Vol. 5, pgs. 74, 101; State's Exhibits 20, 21, 22.

As required by regulatory statutes (RR, Vol. 4, pg. 153), Brown made a report to "DADS" on January 3, 2011. *See* RR, Vol. 4, pgs. 153, 156.

Brown did the report and that "there were some other discrepancies noted in the trust fund, which -- which showed that there were other amounts of money that we could not account for." *See* RR, Vol. 4, pg. 154. At that time, Brown reported that Fuller and Whipkey were both still suspended. *See* RR, Vol. 4, pg. 155. Brown "couldn't single out either one." *See* RR, Vol. 4, pg. 155. Later, Whipkey was allowed to return to work (RR, Vol. 4, pgs. 158, 162), after two or three days. *See* RR, Vol. 4, pg. 245. Brown was "required to report it to the police" and called the "state hotline number." *See* RR, Vol. 4, pg. 155.

Brown continued the investigation but did not complete a report to "DADS" within a five-day deadline because it took longer to do the investigation. *See* RR, Vol. 4, pgs. 156-157.

Miller came to the facility, and she actually headed the audit, with Brown assisting her with it by "looking up stuff." *See* RR, Vol. 4, pgs. 157, 177. Miller was the "lead investigator" and Brown "helped her pull things and copy things." *See* RR, Vol. 4, pg. 180. It was discovered that it was not actual cash missing from the petty cash box. *See* RR, Vol. 4, pgs. 158-159.

At some point in time, Fuller was fired (RR, Vol. 4, pgs. 65, 162) "because there was money that was missing." *See* RR, Vol. 4, pg. 164.

Fuller was terminated. *See* RR, Vol. 5, pg. 107. Fuller filed for unemployment and had an unemployment claim hearing over the phone (RR, Vol. 4, pgs. 182-183), that the employer lost. *See* RR, Vol. 4, pg. 174. The Texas Employment Commission ("TEC") determined, "no misconduct established." *See* RR, Vol. 4, pgs. 174, 183.

Also, Fuller filed a lawsuit that was later settled in federal court. *See* RR, Vol. 4, pgs. 175-176, 217, 224, 229. In this lawsuit, Fuller never made a claim related to her actual termination. *See* RR, Vol. 4, pgs. 222, 226. Matt Holley, an attorney with Haynes and Boone, was hired to represent and defend "Brentwood" in the lawsuit filed by Fuller. *See* RR, Vol. 4, pgs. 210-211, 213. The settlement was a "business decision." *See* RR, Vol. 4, pgs. 218, 220, 223, 231. The amount was for $16,000.00. *See* RR, Vol. 4, pg. 219.

Niesler was the next person, who took over Fuller's job duties. *See* RR, Vol. 4, pgs. 66, 162, 246. In April of 2010, Niesler left to go to another facility. *See* RR, Vol. 4, pg. 66. About four months after her suspension (RR, Vol. 4, pg. 245), Whipkey took over for Niesler in doing Fuller's job. *See* RR, Vol. 4, pgs. 66, 163, 238, 245. Whipkey had the business office position for "about two years." *See* RR, Vol. 4, pg. 246.

"Brentwood" did not have problems with their trust funds or their accounting, after Fuller was gone. *See* RR, Vol. 4, pgs. 68, 163, 246. "We've had no trust fund errors since." *See* RR, Vol. 4, pg. 99. In September of 2011, Thompson went back and passed all the rest of their audits. *See* RR, Vol. 4, pgs. 206-207.

The bookkeeping system did not change. *See* RR, Vol. 4, pg. 68. "Brentwood" got a new "trust fund" in July of 2013. *See* RR, Vol. 4, pg. 68; Vol. 5, pg. 108. "It was just a change company-wide." *See* RR, Vol. 5, pg. 108.

Brown left in August of 2013. *See* RR, Vol. 4, pg. 165. "Brentwood" was in good standing at the time that Brown left. *See* RR, Vol. 4, pg. 165. Whipkey went from accounts payable to marketing, and she stepped down from marketing into a position that was eliminated shortly thereafter due to budget cuts. *See* RR, Vol. 4, pg. 247. Whipkey was asked to come back as the activity director, but she did not take that job because of "the pay." *See* RR, Vol. 4, pg. 247.

**Indictment for a 3rd Degree Felony Theft, Later Reduced; and Jury Trial.**

On December 12, 2013, a grand jury in Lamar County returned an original indictment that charged Fuller with the felony offense of theft of

property, to-wit:  United States currency of the value of $1,500 or more but less than $20,000.  *See* CR, pg. 30.  The original indictment also alleged that the owner of the property was Thomas Hughes, an elderly individual.  *See* CR, pg. 30.

In due course, the trial court called cause number 25545 to trial, and the guilt-innocence phase began on January 28, 2015.  *See* RR, Vol. 4, pg. 5. The jurors were sworn in (RR, Vol. 4, pg. 15), and were provided additional instructions.  *See* RR, Vol. 4, pgs. 15-22.  The State invoked the Rule.  *See* RR, Vol. 4, pg. 22.

Before presenting the indictment (RR, Vol. 4, pgs. 24-25), the State abandoned the allegation that the victim was over 65.  *See* RR, Vol. 4, pg. 24.  Fuller entered a plea of "not guilty."  *See* RR, Vol. 4, pg. 25.

Following opening statements (RR, Vol. 4, pgs. 25-41), the State called Neisler as its first witness of Fuller's three former co-workers.  *See* RR, Vol. 4, pg. 41.  Neisler identified the defendant, Fuller, in open court. *See* RR, Vol. 4, pg. 53.  Two other former co-workers (Whipkey and Miller) identified Fuller in open court.  *See* RR, Vol. 4, pg. 244; Vol. 5, pg. 42.

During the direct-examination of Neisler, the State introduced several exhibits, which the trial court admitted as business records.  *See* RR, Vol. 4,

pg. 95; State's Exhibits 1, 2, 3A, 4, 4A, 5, 6, 7 and 9-19. At that time, the State withdrew exhibits 3 and 8 from admission into evidence, but later defense counsel for Fuller withdrew his objections and the trial court admitted exhibits 3 and 8. *See* RR, Vol. 4, pgs. 106-107, 113. The exhibits were deposits from "Brentwood's" records that were in Fuller's handwriting. *See* RR, Vol. 4, pgs. 96, 119.

Upon the conclusion of testimony from Miller, the State rested. *See* RR, Vol. 5, pg. 135. Fuller made a motion for a directed verdict. *See* RR, Vol. 5, pgs. 135-136. The State responded to that motion (RR, Vol. 5, pgs. 136-142), and the trial court denied the motion. *See* RR, Vol. 5, pg. 142.

After the trial court denied the motion, Fuller rested without putting on any witnesses or other evidence. *See* RR, Vol. 5, pgs. 142-143. The respective parties rested and closed. *See* RR, Vol. 5, pg. 143.

Neither side objected to, and the trial court read, its charge to the jury. *See* RR, Vol. 5, pgs. 144-152; CR, pgs. 112-116. After closing arguments (RR, Vol. 5, pgs. 153-171), the jury retired to begin its deliberations. *See* RR, Vol. 5, pgs. 171-172.

**Verdict:  Guilt-Innocence Phase.**

On January 29, 2015, the jury returned a verdict that found Fuller

guilty of the offense of theft of property more than $1,500.00 but less than 20,000.00, as charged in the indictment. *See* RR, Vol. 5, pg. 173; CR, pg. 117. The verdict was signed by the presiding juror, Greg Raper. *See* CR, pg. 117.

Afterwards, defense counsel re-urged a motion for directed verdict. *See* RR, Vol. 5, pgs. 173, 174. Following brief argument outside the presence of the jury, the trial judge pronounced, "I'm going to grant Mr. Rodgers' motion." *See* RR, Vol. 5, pg. 178. The trial court then discharged the jury. *See* RR, Vol. 5, pgs. 179-180. On January 29, 2015, the trial court signed a judgment notwithstanding the verdict. *See* CR, pg. 126.

### Prior Proceedings in this Court of Appeals.

1. **Petition for Writ of Mandamus.**

On February 3, 2015, the State of Texas, through the County and District Attorney of Lamar County, filed a petition for writ of mandamus, asking this Court for mandamus relief from the judgment entered by the trial court. This Court denied the petition. *See In re The State of Texas*, No. 06-15-00018-CR, 2015 WL 545838, 2015 Tex. App. LEXIS 1277 (Tex. App.--Texarkana February 11, 2015, orig. proceeding) (mem. op., not designated for publication).

2.    **Perfection of Appeal by the State.**

The State timely perfected this appeal from the trial court's judgment notwithstanding the verdict (CR, pg. 126) by filing its notice of appeal on February 17, 2015.  *See* CR, pgs. 127-129.

On or about February 19, 2015, the State filed its notice of appeal in this Court.  The District Clerk of Lamar County filed the Clerk's Record on or about March 19, 2015.  The official court reporter filed the Reporter's Record on or about April 6, 2015.

On or about May 6, 2015, the State filed its motion to extend time for filing its brief.  On May 12th, this Court granted the motion, which extended the time to file for the State to file its motion until June 5, 2015.  The State will be filing its brief on June 5th.

## SUMMARY OF THE ARGUMENT

By this timely appeal, the State seeks to uphold the jury's guilty verdict in a theft case.  *See* RR, Vol. 5, pgs. 173; CR, pg. 117.  After the jury returned its guilty verdict, Fuller re-urged a motion for directed verdict, which the trial court granted.  *See* RR, Vol. 5, pg. 178.  By this appeal, the State asks this Court to reinstate the verdict, reverse the trial court's judgment of January 29, 2015 (CR, pg. 126), and remand.

In the present case, the trial court initially denied Fuller's motion for directed verdict, after the State rested its case-in-chief. *See* RR, Vol. 5, pg. 142. During the defense's case-in-chief, Fuller presented no witnesses or other evidence. After the guilty verdict, the trial court then inexplicably granted Fuller's motion for directed verdict based on the same evidence. That evidence was legally-sufficient, and this Court should find accordingly.

In summary, the evidence was legally-sufficient for a rational Lamar County jury to reasonably find the elements of theft beyond a reasonable doubt; and therefore, the trial court abused its discretion in signing its judgment of January 29, 2015. *See* CR, pg. 126. Thus, this Court should reinstate the verdict, reverse the trial court's judgment, and remand.

## ARGUMENT AND AUTHORITIES

**SOLE ISSUE PRESENTED FOR RELIEF: THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING FULLER'S MOTION FOR DIRECTED VERDICT BECAUSE THE STATE ADDUCED LEGALLY-SUFFICIENT EVIDENCE FOR A LAMAR COUNTY JURY TO REASONABLY FIND THE ELEMENTS OF THE OFFENSE OF THEFT BEYOND A REASONABLE DOUBT.**

A. **The State's Right of Appeal Under Article 44.01 of the Texas Code of Criminal Procedure.**

It was not until 1987 that the State had any right to appeal an adverse legal ruling in a Texas criminal case. *See State v. Redus*, 445 S.W.3d 151,

153 (Tex. Crim. App. 2014). By enacting article 44.01 of the Code of Criminal Procedure, the Texas Legislature recognized the need to balance the rights of the defendant to a fair and speedy trial with the legitimate rights of the State and public to accurate legal rulings. *See id*.

> 1. **The State Had the Right to Appeal the Trial Court's Grant of a New Trial Based on Insufficient Evidence and Article 44.01(a)(3).**

Where the trial court, as in the present case, entered a judgment notwithstanding the verdict, this Court's previous opinion established "the law of the case" by treating it as "the functional equivalent of an order granting a motion for new trial for insufficient evidence." *See In re The State of Texas*, No. 06-15-00018-CR, 2015 WL 545838, at * 1, 2015 Tex. App. LEXIS 1277, at * 3 (Tex. App.--Texarkana February 11, 2015, orig. proceeding) (mem. op., not designated for publication). "The State has the right to appeal a trial court's grant of a new trial based on insufficient evidence." *See id* (citing *Stacy v. State*, 819 S.W.2d 860, 861 (Tex. Crim. App. 1991) (per curiam); Tex. Code Crim. Proc. Ann. Art. 44.01(a)(3) (West Supp. 2014)). Article 44.01(a)(3) of the Texas Code of Criminal Procedure provided that "[t]he state is entitled to appeal an order of a court in a criminal case if the order: (3) grants a new trial." *See* Tex. Code Crim. Proc. Ann. Art. 44.01(a)(3) (West Supp. 2014).

## 2.    <u>**The State Timely Filed its Notice of Appeal.**</u>

Again, this Court's previous opinion established that "the time for a normal appeal by the State ha[d] not expired." *See In re The State of Texas*, 2015 WL 545838, at * 2, 2015 Tex. App. LEXIS 1277, at * 4 (citing Tex. Code Crim. Proc. Ann. Art. 44.01(d) (West Supp. 2014)). Article 44.01(d) provided that "[t]he prosecuting attorney may not make an appeal under Subsection (a) or (b) of this article later than the 20th day after the date on which the order, ruling, or sentence to be appealed is entered by the court." *See* Tex. Code Crim. Proc. Ann. Art. 44.01(d) (West Supp. 2014).

In the present case, the State timely filed its notice of appeal on February 17, 2015 (CR, pg. 127), which was not later than the 20th day after the date on which the trial court entered its judgment notwithstanding the verdict on January 29, 2015. *See* CR, pg. 126. *See* Tex. Code Crim. Proc. Ann. art. 44.01(d) (West Supp. 2014). The State's notice of appeal was "made" by the elected "prosecuting attorney" of Lamar County (CR, pgs. 128-129). *See State v. Muller*, 829 S.W.2d 805, 811-12 (Tex. Crim. App. 1992) (holding the Article 44.01 requires the elected "prosecuting attorney" and not his assistant to "make" the State's notice of appeal within the prescribed time period, either through the physical act of signing the notice

or by personally and expressly authorizing an assistant to file a specific notice of appeal on his behalf).  The State's notice of appeal was signed by Gary D. Young (CR, pgs. 128-129), the elected County and District Attorney of Lamar County.  *See Landers v. State*, 256 S.W.3d 295, 298 (Tex. Crim. App. 2008); *State ex rel. Young v. Sixth Judicial Dist.*, 236 S.W.3d 207, 208-09 (Tex. Crim. App. 2007).

B.    **Standard of Appellate Review:  Granting a New Trial for Legally-Insufficient Evidence.**

"A trial court's JNOV after a jury determination of criminal guilt accomplishes exactly the same effect as granting the defendant a new trial for insufficient evidence--a functional acquittal."  *See State v. Savage*, 933 S.W.2d 497, 499 (Tex. Crim. App. 1996).  Because the effect of the trial court granting Fuller's judgment non obstante veredicto was the same as if it had granted a motion for new trial based on insufficiency of the evidence, this Court should review the order as if the trial court had granted a motion for new trial.  *See State v. Savage*, 905 S.W.2d 272, 274 (Tex. App.--San Antonio 1994), *aff'd*, 933 S.W.2d 497, 499 (Tex. Crim. App. 1996).

A motion for new trial based on insufficiency of the evidence presents a legal rather than a factual question, and the trial court must apply the same legal test employed on appeal.  *See State v. Chavera*, 386 S.W.3d 334, 336

-22-

(Tex. App.--San Antonio 2012, no pet.); *Savage*, 905 S.W.2d at 274; *State v. Moreno*, 297 S.W.3d 512, 520 (Tex. App.--Houston [14th Dist.] 2009, pet. ref'd). The trial court must decide, after viewing the evidence in the light most favorable to the verdict, whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Chavera*, 386 S.W.3d at 336; *Savage*, 905 S.W.2d at 274; *Moreno*, 297 S.W.3d at 520. If the evidence meets the standard, it is an abuse of discretion for the trial court to grant the motion for new trial. *See id*.

Viewing the evidence in the light most favorable to the verdict under a legal-sufficiency standard means the reviewing court is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Chavera*, 386 S.W.3d at 337 (citing *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010)). When reviewing the evidence, the trial court may not sit as the thirteenth juror and may not substitute its beliefs for those of the jury. *See Chavera*, 386 S.W.3d at 337; *Moreno*, 297 S.W.3d at 520.

C.   **The Law:  Theft of Property.**

A person commits an offense if he unlawfully appropriates property

with intent to deprive the owner of property. *See* Tex. Penal Code Ann. § 31.03(a) (West Supp. 2014). "Appropriate" means to "acquire or otherwise exercise control over property other than real property." *See* Tex. Penal Code Ann. § 31.01(4)(B) (West Supp. 2014).

In *Stewart v. State*, 44 S.W.3d 582 (Tex. Crim. App. 2001), a theft case involving money, the Texas Court of Criminal Appeals reasoned that the statutory definition of "appropriate" encompassed more than one method of appropriation, and that each of those methods comprised more than one way of meeting the definition. *See id*. at 588 (citing *Gorman v. State*, 634 S.W.2d 681 (Tex. Crim. App. 1982)). In *Stewart*, the Court further reasoned that although exercising control was primarily directed at those thefts that involve only possession, it also encompassed conduct that did not involve possession. *See Stewart*, 44 S.W.3d at 588 (citing *Gorman*, 634 S.W.2d at 683).

Although the *Gorman* case did not elaborate on the type of conduct which would qualify as "exercising control" without involving possession, the Court of Criminal Appeals in *Stewart* determined that "[a]nyone who is in a position to take some action that deprives the owner of property is in a position to exercise control." *See Stewart*, 44 S.W.3d at 588-89. In *Stewart*,

the Court held that "the crucial element of theft is the deprivation of property from the rightful owner, without the owner's consent, regardless of whether the defendant at that moment has taken possession of the property." *See id.* at 589. In *Stewart*, the appellant "exercised control" over the property and committed theft when, by his threats, he caused the complainant to release the money to the police in Montgomery County. *See id* (reference to footnote omitted).

It was not essential that the property be taken off the premises; it was instead only essential that the evidence showed an "exercise of control over the property," coupled with an "intent to deprive the owner of the property." *See Hill v. State*, 633 S.W.2d 520, 521 (Tex. Crim. App. 1981). In *Bailey v. State,* 885 S.W.2d 193 (Tex. App.--Dallas 1994, pet. ref'd), the court of appeals reasoned that control was sufficient to establish possession under the Texas Penal Code. *See id.* at 198.

> D.     **Application of Law to the Present Case.**
>
> 1.     **Fuller's Argument in the Trial Court Below.**

After the jury's verdict of guilty in the present case (RR, Vol. 5, pg.

173), Fuller re-urged her motion for a directed or instructed verdict.[1]  Fuller had a case on point, "Rosenbush versus State."  *See* RR, Vol. 5, pgs. 173-174.  In *Rosenbush v. State*, 136 Tex. Crim. 50, 122 S.W.2d 1071 (1938), the proof showed no more than an intention to steal, as the accused never got control or possession of the calf that got away with the accuser's rope while the accused was in the act of trying to steal the calf.  *See Pennington v. State*, 416 S.W.2d 815, 816 (Tex. Crim. App. 1967).

2.    **The Element of "Appropriate" and Applying the Statutory Definition of "Exercising Control" Without Involving Possession.**

Contrary to the defensive theory in this case, the *Stewart* Court analyzed the type of conduct, which would qualify as "exercising control" without involving possession.  *See Stewart*, 44 S.W.3d at 588-89.  In *Stewart*, the Court held that anyone, who was in a position to take some action that deprived the owner of property, was in a position to exercise control.  *See id.*  In the present case, that person was Fuller.  *See id.*

a.    **Fuller Was in a Position to Take Some Action, To Exercise**

---

[1] At that time, Fuller's motion did not re-submit her previous argument based on the civil lawsuit with Diversicare that "we believe there's collateral estoppel issues there."  By not re-submitting the argument, Fuller waived that issue.  *See* Tex. R. App. P. 33.1(a).  Even assuming error preservation, collateral estoppel did not apply.  *See*, *e.g*., *Ex parte Serna*, 957 S.W.2d 598, 601 (Tex. App.--Fort Worth 1997, orig. proceeding) (collateral estoppel applies in criminal cases but an appellate court should conduct a painstaking review of the initial action *only where* the initial action resulted in a general verdict of acquittal). Here, the initial action allegedly resulted in a settlement of the civil case, not a general verdict of acquittal.

-26-

**Control.**

As defined in *Stewart*, Fuller was in a position to take some action and to exercise control because she was the person responsible for filling out the paperwork to account for how much money was taken in for any day. *See* RR, Vol. 4, pgs. 58, 192, 239-240. Fuller made all the deposits for the "AR side" (accounts receivable). *See* RR, Vol. 4, pgs. 46-47; Vol. 5, pgs. 7, 14-15, 25. Not coincidentally, the evidence established that "Brentwood" did not have problems with their trust funds or their accounting, after Fuller was gone. *See* RR, Vol. 4, pgs. 99 ("We've had no trust fund errors since."); 68, 163, 246. From that evidence, and the reasonable inference or inferences to be drawn from that evidence, the jury could have reasonably found that Fuller was in a position to take some action that deprived the owner of property and was in a position to exercise control. *See Stewart*, 44 S.W.3d at 588-89.

b. **Miller's Testimony Provided Sufficient Evidence to Prove this Element: "Appropriate" Property.**

Then, the State adduced sufficient evidence to prove the remaining elements of theft through the testimony of Miller, the regional financial specialist, whose testimony can be summarized from re-direct examination:

Q.    Okay. One more time. How many years have you

been doing this?

A. Since June of 1990.

Q. How many years is that?

A. Almost 25.

Q. Okay. One more time for the record, Mr. Rodgers cross-examined you to the effect that Erica Fuller didn't take anything from Brentwood. The money was transferred from one to the other account. One more time, is there a deposit of $1,416.84 pictured in State's 3 anywhere in the books for either bank account for Brentwood?

A. No.

Q. Who is responsible for taking the money collected, cash or check, and depositing it?

A. Erica Fuller.

Q. Is there anywhere in the bank records, the deposit slips, a sum of money, $2,031 for Mr. Boswell in July?

A. No.

Q. And who would have been responsible for taking that deposit to the bank and depositing it?

A. Erica Fuller.

Q. October 4th, 2010. Is there anywhere a deposit of $775.00 for McFadden in the bank account records?

A. No.

Q. For either side?

A.     No.

Q.     December 6th, State's Exhibit 14, is there anywhere in the bank records of the deposits for either side, either account, a deposit of $137.00 in cash?

A.     No.

Q,     The bookkeeping -- and who would've been responsible for taking that 137.50 to the bank and depositing it?

A.     Erica Fuller.

Q.     Who would've been responsible for taking McFadden's $775.00 check to the bank?

A.     Erica Fuller.

Q.     Now, so Brentwood never got that money that's represented by those four deposits?

A.     Correct.

Q.     Whose money was used to pay Brentwood's operations fund?

A.     Mr. Hughes' account.

Q.     And so, who is out the money --

A.     Mr. Hughes.

Q.     -- as of December 2010?

A.     Mr. Hughes.

Q.     And how much money is Mr. Hughes out?

A.     Approximately $8,000.

Q.     Now, did Brentwood pay him back?

A.     Yes, they did.

RR, Vol. 5, pgs. 132-134.  This testimony proved theft of U.S. currency.

c.     **Fuller's Consciousness of Guilt.**

In addition to Miller's testimony above, the State established Fuller's consciousness of guilt through the testimony of administrator Brown, who testified that when she first started working at "Brentwood," Fuller came into her office on a couple of occasions and asked if she was going to fire her. *See* RR, Vol. 4, pg. 135.  Brown testified that she told Fuller "no," and that she "wasn't there to fire anybody" as the new administrator.  *See* RR, Vol. 4, pg. 135.  Brown described Fuller as "fidgety" and "very inquisitive" on why she was there.  *See* RR, Vol. 4, pg. 136.  *See also* RR, Vol. 4, pg. 168.

Whether Fuller's acts towards Brown were the result of, or based on a consciousness of guilt, was an issue for the jury.  *See Whitney Ladell Blake v. The State of Texas*, No. 06-11-00097-CR, 2012 Tex. App. LEXIS 926, at * 18, 2012 WL 361730, at * 4 (Tex. App.--Texarkana February 2, 2012, pet. ref'd) (mem. op., not designated for publication).  As in *Blake*, an

unpublished opinion and previous appeal from Lamar County, a rational jury could have reasonably concluded that Fuller acted towards Brown in that way because she knew she was committing theft. *See id.*

E. **Conclusion.**

Viewing the evidence in the light most favorable to the jury's verdict under the legal-sufficiency standard, this Court should defer to the jury's credibility and weight determinations because the jury was the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Chavera*, 386 S.W.3d at 337 (citing *Brooks*, 323 S.W.3d at 899). Here, the jury could have reasonably found the elements of theft beyond a reasonable doubt, and the trial court erred in sitting as the thirteenth juror and in substituting its beliefs for those of the jury. *See Chavera*, 386 S.W.3d at 337; *Moreno*, 297 S.W.3d at 520. Because the evidence was sufficient and met the *Brooks* standard of legal-sufficiency, it was an abuse of discretion for the trial court to grant the motion for new trial. *See Chavera*, 386 S.W.3d at 336; *Savage*, 905 S.W.2d at 274; *Moreno*, 297 S.W.3d at 520.

Even further, of significance, the trial court denied Fuller's motion for directed verdict at first (RR, Vol. 5, pg. 142), and the defense rested and closed without presenting any witnesses or other evidence. *See* RR, Vol. 5,

pgs. 142-143.  By later granting Fuller's motion, the trial court granted a judgment notwithstanding the verdict based on the exact same evidence that the State had presented when it rested its case-in-chief.  By granting Fuller's motion, that ruling by the trial court, based on the evidence, was outside the zone of reasonable disagreement because there was no conflicting evidence presented.  On this additional basis, the trial court abused its discretion.

Accordingly, this Court should reverse the trial court's judgment notwithstanding the verdict, reinstate the jury's verdict, and remand.  *See United States v. Wilson*, 420 U.S. 332, 344-45 (1975) (since reversal  on appeal would merely reinstate the jury's verdict, review of such an order does not offend the policy against multiple prosecution).

On remand, for the punishment phase, the trial court could recall the jurors that previously found Fuller guilty, since she elected for the jury to assess punishment.  *See* CR, pg. 83.  Presumably, the trial court could recall the jurors by issuing summons or, alternatively, by issuing writs of attachment for the jurors, if necessary.  In the further alternative, Fuller could waive her previous election (CR, pg. 83), and have the trial judge decide punishment.  Regardless of her election, the punishment phase could proceed on remand for further proceedings in a manner to be designated by

this Court.

In the further alternative, this Court could reverse and remand cause number 25545 for a new trial of guilt-innocence and punishment. Regardless, the trial court's judgment notwithstanding the verdict cannot stand.

## PRAYER

WHEREFORE PREMISES CONSIDERED, the State of Texas prays that this Court set the above-styled and numbered appellate cause for oral argument, and that upon final submission with oral argument, this Court reverse the trial court's judgment and remand the case for further proceedings; or, in the alternative, for a new trial; and for such other and further relief, both at law and in equity, to which it may be legally entitled.

Respectfully submitted,

Jeffrey W. Shell, *Attorney Pro Tem*
Attorney & Counselor at Law
2085 Berkdale Lane
Rockwall, Texas   75087
(214) 244-8480
(972) 204-6809

By:     s/s jeffrey w. shell
     Jeffrey W. Shell, *Attorney Pro Tem*
     SBN# 18191660
     jws0566@yahoo.com

Gary D. Young, County and District Attorney
Lamar County and District Attorney's Office
Lamar County Courthouse
119 North Main
Paris, Texas   75460
(903) 737-2470
(903) 737-2455 (fax)

By:_____

Gary D. Young, County & District Attorney
SBN# 00785298
gyoung@co.lamar.tx.us

**ATTORNEYS FOR THE  STATE OF TEXAS**

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 9.4(i)(3) of the Texas Rules of Appellate Procedure, the "Appellant's (State's) Brief" was a computer-generated document and contained 8413 words--not including the Appendix, if any.  The undersigned attorney certified that he relied on the word count of the computer program, which was used to prepare this document.

_____

GARY D. YOUNG
gyoung@co.lamar.tx.us

## CERTIFICATE OF SERVICE

This is to certify that in accordance with Tex. R. App. P. 9.5, a true copy of the "Appellant's (State's) Brief" has been served on the 5th day of June, 2015 upon the following:

James R. Rodgers
The Moore Law Firm, L.L.P.
100 North Main Street
Paris, Texas 75460

_____
GARY D. YOUNG
gyoung@co.lamar.tx.us